FILED

AUG 15 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JOHN MIMOSA MARKS, PRO SE
386 14TH ST.
OAKLAND, CA 94607
JOHN.MARKS@HOMELESSINCORPORATED.COM
415-961-7213

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

CV 25-6932

**JOHN MIMOSA MARKS,** ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

PLAINTIFF,

V.

**DONALD JOHN TRUMP,**

IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES;

**PAMELA JO BONDI,**

IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES;

**ROBERT F. KENNEDY JR.,**

IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES;

**SCOTT TURNER,**

IN HIS OFFICIAL CAPACITY AS SECRETARY OF HOUSING AND URBAN DEVELOPMENT;

**SEAN P. DUFFY,**

IN HIS OFFICIAL CAPACITY AS SECRETARY OF TRANSPORTATION;

AND **THE UNITED STATES OF AMERICA,**

DEFENDANTS.

Case No.:    JCS

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 1

# TABLE OF CONTENTS

i.    PRELIMINARY STATEMENT ........................................................ 2

ii.    EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION     3

iii.    TABLE OF AUTHORITIES ............................................................ 4

CLASS ACTION ALLEGATIONS RESERVATION ............................. 9

PARTIES ........................................................................................ 11

JURISDICTION & VENUE............................................................... 13

PLAINTIFF'S STANDING AND RIPENESS ...................................... 18

STATEMENT OF FACTS ................................................................. 20

CLAIMS ......................................................................................... 49

REQUEST FOR PRELIMINARY INJUNCTION.................................. 78

REQUEST FOR PERMANENT INJUNCTION..................................... 86

PRAYER FOR RELIEF .................................................................... 93

DEMAND FOR JURY TRIAL ........................................................... 97

# I.   PRELIMINARY STATEMENT

This is a federal civil rights action challenging the constitutionally deficient Executive Order titled "Ending Crime and Disorder on America's Streets," signed by President Donald John Trump on July 24, 2025. The Executive Order mandates the involuntary civil commitment of homeless individuals nationwide, violating fundamental due process rights, equal protection guarantees, and federal disability rights laws. Plaintiff seeks immediate injunctive relief to prevent the implementation of this unconstitutional policy that threatens the liberty, dignity, and lives of the most vulnerable members of our society.

Plaintiff has Article III standing because enforcement of Executive Order No. 14321 places him at imminent and particularized risk of involuntary civil commitment, loss of liberty, and life-threatening medical harm; these injuries are directly traceable to Defendants' actions and redressable by this Court through injunctive and declaratory relief. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); Massachusetts v. EPA, 549 U.S. 497, 525–26 (2007). Plaintiff seeks only prospective injunctive and declaratory relief against federal officials acting beyond constitutional authority, a form of relief not barred by sovereign immunity. See Ex parte Young, 209 U.S. 123 (1908); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–91 (1949).

## II.    EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiff applies ex parte for a Temporary Restraining Order immediately enjoining Defendants from enforcing, implementing, or otherwise acting under Executive Order No. 14321 ("Ending Crime and Disorder on America's Streets"), 90 Fed. Reg. 35817 (July 24, 2025), insofar as it mandates or authorizes the civil commitment, detention, institutionalization, removal, or segregation of unhoused persons based on housing status or perceived inability to "care for themselves," and from taking any action to reverse, terminate, or abrogate judicial precedents or consent decrees protecting due process and integration rights of persons with disabilities.

**Certification Under Rule 65(b)(1)(B):** Plaintiff certifies that immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition. The Executive Order is presently in effect and being implemented nationwide; Plaintiff's prior involuntary psychiatric detention, visible disability, complex medical needs (including ventriculoperitoneal shunt, epilepsy, COPD, and hypertension), and high-profile advocacy place him at imminent and particularized risk of unlawful detention without adequate procedural safeguards. Moreover, advance notice risks precipitating retaliatory enforcement or preemptive action by Defendants or their agents before this Court can intervene. Plaintiff will make reasonable and good-faith efforts to notify Defendants' counsel promptly upon filing, but respectfully requests that the Court

consider this application ex parte given the extraordinary urgency and the life-and-death

stakes.

      Plaintiff further requests that the Court issue an **Order to Show Cause**

setting an expedited hearing on a preliminary injunction within **48 hours**, with briefing

and service to be completed on a schedule set by the Court.

      **Grounds for Relief:** Plaintiff demonstrates:

1. **Likelihood of success on the merits** under the Fifth and Fourteenth Amendments, the Americans with Disabilities Act (42 U.S.C. §§ 12131–12134), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), the Fair Housing Act (42 U.S.C. §§ 3601–3619), and 42 U.S.C. § 1983, as detailed in the Complaint.

2. **Irreparable harm** from imminent and unlawful loss of liberty, denial of medical accommodations, and life-threatening health risks, each of which independently warrants emergency relief.

3. **Balance of equities** tipping sharply in favor of Plaintiff, whose life, health, and constitutional rights are at stake, versus minimal burden to Defendants from temporary delay.

4. **Public interest** in preserving constitutional protections, preventing unnecessary institutionalization, and ensuring compliance with federal disability rights laws.

      **Security Bond:** Plaintiff requests waiver of any bond requirement under

Rule 65(c) because he is indigent, proceeds in forma pauperis, and seeks to vindicate

significant public rights where a security would be an unjust barrier to judicial review.


# III.    TABLE OF AUTHORITIES

## TABLE OF AUTHORITIES

Page(s)

## US SUPREME COURT CASES

Ex parte Young, 209 U.S. 123 (1908) .................................................. 2, 17, 18

Larson v. Domestic & Foreign Commerce Corp.
    (1949) 337 U.S. 682 .............................................................................. 2, 18

Dugan v. Rank
    (1963) 372 U.S. 609 .................................................................................. 18

Spokeo, Inc. v. Robins
    (2016) 578 U.S. 330 .................................................................................. 19

Massachusetts v. EPA
    (2007) 549 U.S. 497 .................................................................................. 19

Havens Realty Corp. v. Coleman
    (1982) 455 U.S. 363 .................................................................................. 19

Abbott Labs. v. Gardner
    (1967) 387 U.S. 136 .................................................................................. 20

Youngberg v. Romeo
    (1982) 457 U.S. 307 .................................................................................. 44

Jackson v. Indiana
    (1972) 406 U.S. 715 .................................................................................. 44

Olmstead v. L.C.
    (1999) 527 U.S. 581 ........................................ 22, 24, 34, 39, 41, 44, 56, 80, 94

Robinson v. California
    (1962) 370 U.S. 660 ............................................................ 29, 33, 44, 68

City of Grants Pass v. Johnson
    (2024) 603 U.S. 520 .................................................................................. 44

Foucha v. Louisiana
    (1992) 504 U.S. 71 .............................................................................. 42, 50

Addington v. Texas, 441 U.S. 418, 433 (1979) ...................................... 50, 51

O'Connor v. Donaldson, 422 U.S. 563, 575 (1975) ................................... 51

J. W. Hampton, Jr. & Co. v. United States
    (1928) 276 U.S. 394 .................................................................................. 51

*City of Chicago v. Morales*
    (1999) 527 U.S. 41 ............................................................................. 54

*O'Connor*
    422 U.S. 576 ........................................... 54, 62, 79, 83, 84, 95

*Bolling v. Sharpe*
    (1954) 347 U.S. 497 ......................................................................... 67

U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528, (1973) ........................................ 68

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*
    (1977) 429 U.S. 252 ......................................................................... 68

*United States v. Lopez*
    (1995) 514 U.S. 549 ......................................................................... 74

*New York v. United States*
    (1992) 505 U.S. 144 ......................................................................... 77

*Printz v. United States*
    (1997) 521 U.S. 898 ......................................................................... 77

*Winter v. Natural Resources Defense Council, Inc.*
    (2008) 555 U.S. 7 ............................................................................. 79

*Addington v. Texas*
    (1979) 441 U.S. 418 .................................... 42, 44, 51, 54, 63, 79, 84, 95

*County of Sacramento v. Lewis*
    (1998) 523 U.S. 833 .............................................................. 62, 63, 80

*City of Cleburne v. Cleburne Living Center*
    (1985) 473 U.S. 432 .......................................... 39, 40, 44, 67, 80

*Romer v. Evans*
    (1996) 517 U.S. 620 .............................................................. 68, 80

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 .................................................... 51, 73, 74, 80

*eBay Inc. v. MercExchange, L.L.C.*
    (2006) 547 U.S. 388 ......................................................................... 86

*Carey v. Piphus*
    435 U.S. 266 ............................................................................. 87, 88

209 U.S. 159 ............................................................................. 89

*Bounds v. Smith*
    (1977) 430 U.S. 817 ................................................................. 90

***FEDERAL CASES***

*Bolmer v. Oliveira*
    (2d Cir. 2010) 594 F.3d 134 .................................................... 63

*Martin v. City of Boise*
    (9th Cir. 2018) 902 F.3d 1031 ................................................. 69

*United States v. Hall*
    (4th Cir. 2012) 664 F.3d 456 .................................................... 74

*Chamber of Commerce v. Reich*
    (D.C. Cir. 1996) 74 F.3d 1322 ................................................ 74

*Professionals & Patients for Customized Care v. Shalala*
    (5th Cir. 1995) 56 F.3d 592 ...................................................... 75

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*
    (5th Cir. 1981) 636 F.2d 1084 ................................................. 82

*Washington v. Trump*
    (D.D.C. 2022) 582 F. Supp. 3d 295 ................................... 83, 85

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*
    (6th Cir. 1994) 23 F.3d 1071 .............................................. 82, 84

*Newsom v. Albemarle Cnty. Sch. Bd.*
    (4th Cir. 2003) 354 F.3d 249 .................................................... 87

***US CONSTITUTIONAL PROVISIONS***

Amendment XIV
    § 1 ............................................. 23, 25, 26, 27, 28, 31, 32, 34, 35, 37, 40, 42, 49, 67

Amendment I
    25, 27, 29, 36, 37, 42

Amendment V

29, 43, 49

Amendment VIII
    33

Article I
    § 1.................................................................................................................73

Article II
    § 3.................................................................................................................73

Amendment X
    73

***FEDERAL STATUTES***

42 U.S.C. §§ 12131–12134...................................4, 23, 25, 27, 28, 30, 32, 35, 38, 43, 56

Title 29 U.S.C.
    § 794...........4, 14, 15, 22, 23, 25, 27, 28, 30, 31, 33, 34, 38, 39, 40, 43, 56, 76, 94
    § 794(a).........................................................................................................30

Title 42 U.S.C.
    § 3601..................................................................................4, 14, 15, 39, 40, 43
    § 1983..............4, 14, 18, 23, 25, 26, 28, 32, 37, 38, 40, 42, 44, 49, 56, 62, 67, 73
    § 12102...........................................................................................................9
    § 12101..............................................................................14, 15, 39, 40, 43, 76, 94
    § 12133..........................................................................................................15
    § 12132...................................................................22, 23, 30, 33, 34, 40, 57
    § 3604...............................................................................................26, 29, 43
    § 12203................................................................................31, 33, 38, 43
    § 3604(f)...................................................................................................38, 43
    § 1988..........................................................................................................97
    § 12205.........................................................................................................97

Title 5 U.S.C.
    § 701...................................................................................................13, 14, 15

Title 28 U.S.C.
    § 1331.................................................................................................13, 15
    § 2201..................................................................................14, 15, 44, 93
    § 1391(e)(1) ....................................................................................................14
    § 1343...........................................................................................................15

Title 31 U.S.C.
    § 3729....................................................................................................30, 33

*FEDERAL RULES*

Fed. R. Civ. P.

Rule 65 ...................................................................................3, 4, 15
Rule 23(b)(2).................................................................9, 11, 85, 86, 97
Rule 23(a).............................................................................................97
Rule 23(g).............................................................................................97
Rule 54(d).............................................................................................97
Rule 28.................................................................................................97
Rule 38(b).............................................................................................97

*FEDERAL REGULATIONS*

Title 28 C.F.R.

§ 35.130(d)...........................................................................................56

Title 45 C.F.R.

§ 84.76(a) .............................................................................................57
§ 84.76(b).......................................................................................57, 60

*OTHER AUTHORITIES*

Executive Order 14321, titled "Ending Crime and Disorder on America's Streets" (90
FR 35817) ...............................................................3, 14, 18, 20, 54

Federal Bar Association Pro Se Handbook (2019) .......................................85

# CLASS ACTION ALLEGATIONS RESERVATION

1. Plaintiff, JOHN MIMOSA MARKS, brings this action on behalf of himself and
   all others similarly situated, and reserves the right to move for class certification
   under Federal Rule of Civil Procedure 23(b)(2). Proposed subclasses include but
   are not limited to:

2. Persons with disabilities as defined by the Americans with Disabilities Act
   ("ADA"), 42 U.S.C. § 12102.

3. Families with minor children.

4. Black, Indigenous, and People of Color ("BIPOC") experiencing homelessness.

5. United States military veterans experiencing homelessness.

6. The proposed class consists of all persons in the United States, presently unhoused or experiencing housing instability, who are or will be subject to enforcement of the Executive Order titled "Ending Crime and Disorder on America's Streets," signed July 24,2025 including, but not limited to, those identified as members of the above subclasses.

7. The numerosity, commonality, typicality, and adequacy requirements of Rule 23 are satisfied. The class and subclasses each comprise hundreds or thousands of members, including an estimated 650,000 homeless individuals nationwide. Common questions of law and fact include, without limitation: whether the Executive Order deprives class members of liberty without due process; whether it discriminates against protected classes, including persons with disabilities, BIPOC individuals, and families with minor children, in violation of constitutional and statutory rights; and whether the Order is facially or as-applied unconstitutional.

8. Plaintiff's claims are typical, and he will fairly and adequately protect the interests of absent class members. Plaintiff seeks prospective equitable relief, including declaratory and injunctive orders, redressing imminent and irreparable harm to the liberty, due process, and equal protection rights of all persons

similarly situated.

9.  Pursuant to Rule 23(b)(2), injunctive and declaratory relief is appropriate given
    the Defendants' uniform enforcement of the challenged Executive Order against
    the class as a whole.

10. Plaintiff expressly reserves the right to amend or supplement the class definitions
    and to seek class counsel as the case progresses.

# PARTIES

### 11. PLAINTIFFS

12. **JOHN MIMOSA MARKS**, Pro Se

    386 14th St, Oakland, CA 94612

    An unhoused individual residing in Oakland, California, subject to and
    imminently threatened by enforcement of the July 24th, 2025 Executive Order
    (EO) entitled "Ending Crime and Disorder on America's Streets." Mr. Marks
    brings this action on behalf of himself and all others similarly situated, both

individually and as putative representative of the proposed classes and subclasses detailed above.

13. **DEFENDANTS**

14. DEFENDANTS

15. **DONALD JOHN TRUMP**, in his official capacity as President of the United States. As President, Mr. Trump is ultimately responsible for the issuance and implementation of the Executive Order titled "Ending Crime and Disorder on America's Streets," which is challenged in this action. He may be served at: The White House, 1600 Pennsylvania Avenue NW, Washington, DC 20500.

16. **PAMELA JO BONDI**, in her official capacity as Attorney General of the United States. As Attorney General, Ms. Bondi oversees the United States Department of Justice and all federal law enforcement agencies charged with implementing and enforcing the Executive Order. She may be served at: U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001.

17. **ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of Health and Human Services. As HHS Secretary, Mr. Kennedy is responsible for supervising federal health programs and agencies involved in the civil commitment mandates of the challenged Executive Order. He may be served at: U.S. Department of

Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201.

18. **SCOTT TURNER**, in his official capacity as Secretary of Housing and Urban Development. As HUD Secretary, Mr. Turner oversees federal housing policy and programs directly implicated by the Executive Order's nationwide implementation. He may be served at: U.S. Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410.

19. **SEAN P. DUFFY**, in his official capacity as Secretary of Transportation. As Secretary, Mr. Duffy oversees agencies that may assist in the transportation, detention, or institutionalization of individuals under the Executive Order's mandate. He may be served at: U.S. Department of Transportation, 1200 New Jersey Avenue SE, Washington, DC 20590.

20. **THE UNITED STATES OF AMERICA** is named as a defendant pursuant to the relevant provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and as necessary for complete relief.

# JURISDICTION & VENUE

**JURISDICTION AND VENUE — SUPPLEMENTAL AUTHORITY**

21. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3)–(4) (civil rights jurisdiction). This action arises under

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 13

the Constitution, laws, and treaties of the United States, including the Fifth and Fourteenth Amendments, the Americans with Disabilities Act (42 U.S.C. §§ 12101–12213), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), the Fair Housing Act (42 U.S.C. §§ 3601–3619), and 42 U.S.C. § 1983. Jurisdiction is also proper under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

22. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because (1) a substantial part of the events or omissions giving rise to the claims occurred in this District; (2) Plaintiff resides in this District; and (3) all Defendants are officers of the United States sued in their official capacities. The Northern District of California, Oakland Division, is the most appropriate forum because the threatened enforcement of Executive Order No. 14321 is occurring here through coordination with local and state actors, causing imminent harm to Plaintiff and putative class members in this Division.

23. **Subject-Matter Jurisdiction**

24. **Venue**

25. Venue is proper in the United States District Court for the Northern District of California, Oakland Division, under 28 U.S.C. § 1391(e)(1). Plaintiff resides within this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred and will continue to occur within this district.

26. The Executive Order titled "Ending Crime and Disorder on America's Streets" is being implemented nationwide, including within the Northern District of California, where Plaintiff faces imminent threat of enforcement. Local law enforcement agencies, federal agencies, and state actors within this district are actively preparing to enforce the Executive Order's mandates, creating ongoing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 14

and irreparable harm to Plaintiff and similarly situated individuals residing in Oakland and throughout the district.

### 27. JURISDICTION

28. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction). This action arises under the Constitution and laws of the United States, including the Fifth and Fourteenth Amendments to the United States Constitution (Due Process and Equal Protection Clauses), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.

29. The Court has jurisdiction to review agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and to issue declaratory judgments under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. The Court has authority to grant injunctive relief under 42 U.S.C. § 12133 (ADA enforcement), Federal Rule of Civil Procedure 65, and its general equitable powers.

30. Plaintiff's claims for constitutional violations are primarily grounded in the Fifth and Fourteenth Amendments, establishing fundamental due process and equal

protection violations that form the core basis for emergency and preliminary injunctive relief. The constitutional claims take precedence as they are not subject to administrative exhaustion requirements and present direct challenges to Executive action that threatens imminent and irreparable harm to Plaintiff's fundamental liberty interests.

31. Supplemental federal statutory claims under the ADA, Rehabilitation Act, and Fair Housing Act support the constitutional violations and bolster the Court's authority to grant comprehensive prospective relief protecting Plaintiff and the proposed class from ongoing discrimination and constitutional injury.

32. Plaintiff seeks emergency and preliminary injunctive relief to halt implementation of the Executive Order pending full adjudication of this matter. The imminent and irreparable constitutional harm justifies the Court's expedited exercise of jurisdiction under established precedent governing challenges to Executive orders that threaten fundamental rights without adequate procedural safeguards.

33. Plaintiff expressly reserves arguments regarding standing, sovereign immunity defenses, and any other jurisdictional challenges that may be raised by Defendants, while noting that injunctive relief against federal officials acting in

excess of their constitutional authority is proper under the doctrine established in

Ex parte Young, 209 U.S. 123 (1908), and its progeny.

34. Plaintiff's history of advocacy against local housing service providers, his

documented interactions with Oakland-area law enforcement and service

agencies, and his current residence in Oakland establish that the constitutional

violations alleged herein have manifested and will continue to manifest within

this district. The threatened enforcement of the Executive Order against Plaintiff

and class members creates immediate, concrete, and particularized injury within

the territorial jurisdiction of this Court.

35. Personal jurisdiction over the federal defendants is proper under established

precedent governing suits against federal officials in their official capacity.

Plaintiff expressly reserves all arguments regarding personal jurisdiction and the

Court's authority to issue prospective relief against federal defendants acting

under color of federal law.

36. SOVEREIGN IMMUNITY AND PROSPECTIVE RELIEF

37. This action is brought against federal officers in their official capacities for

prospective declaratory and injunctive relief to halt ongoing violations of the

Constitution and federal law. Sovereign immunity does not bar such claims

because Plaintiff alleges ultra vires acts and constitutional violations for which prospective relief is available under the doctrine articulated in Ex parte Young, 209 U.S. 123 (1908), and its federal analogue. See also *Larson*, 337 U.S. at 689–91 (sovereign immunity does not bar suits against officers acting beyond their statutory authority or unconstitutionally); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963). Plaintiff does not seek monetary damages from the United States or its agencies, but solely equitable relief necessary to prevent ongoing and imminent violations of the Fifth and Fourteenth Amendments, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Fair Housing Act, and 42 U.S.C. § 1983.

## PLAINTIFF'S STANDING AND RIPENESS

38. Plaintiff has Article III standing to bring this action and the claims are ripe for adjudication.

39. **Injury in Fact.** Plaintiff faces an actual and imminent injury: enforcement of Executive Order No. 14321 ("Ending Crime and Disorder on America's Streets") places him at immediate risk of involuntary civil commitment, loss of liberty, and life-threatening harm due to his complex medical needs, history of involuntary psychiatric detention under California Welfare & Institutions Code § 5150, and public advocacy opposing punitive homeless policies. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (injury in fact must be concrete, particularized, and actual or imminent); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (threatened injury is imminent when it is "certainly impending"

or there is a "substantial risk" that the harm will occur). Plaintiff's risk is neither speculative nor hypothetical; the EO is currently in force, nationwide in scope, and specifically targets individuals in Plaintiff's situation.

40. **Traceability.** Plaintiff's injuries are fairly traceable to Defendants' conduct, as the EO is promulgated by Defendant President Trump and enforced by the federal agencies and officials named herein. The EO's directives and funding conditions compel and coordinate state and local enforcement that will directly impact Plaintiff in Oakland, California. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (injury must be fairly traceable to challenged action).

41. **Redressability.** The requested injunctive and declaratory relief will redress Plaintiff's injury by halting the enforcement of the EO and preventing his unlawful detention and institutionalization, thereby preserving his constitutional rights and preventing life-threatening medical harm. *See Massachusetts v. EPA*, 549 U.S. 497, 525–26 (2007) (redressability satisfied where favorable decision will lessen threatened injury).

42. **Organizational and Associational Harm.** Plaintiff is the founder of a nonprofit advocacy organization for unhoused persons, which is harmed by the diversion of resources to respond to the EO's enforcement and the frustration of its mission. These organizational injuries are independently sufficient for standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

43. **Ripeness.** This case presents a purely legal dispute regarding the constitutionality of EO 14321 and its immediate enforcement. Plaintiff's claims are fit for judicial review because the EO is presently operative, its directives require no further

factual development, and withholding review would cause immediate hardship by exposing Plaintiff to imminent unconstitutional detention. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

44. Accordingly, Plaintiff's claims satisfy the constitutional and prudential requirements for standing and ripeness. Defendants' enforcement of EO 14321 presents an actual case or controversy within the meaning of Article III, and this Court has jurisdiction to grant the relief requested.

# STATEMENT OF FACTS

### 45. Executive Order 14321

46. On July 24, 2025, President Donald J. Trump signed Executive Order 14321, titled "Ending Crime and Disorder on America's Streets" (90 FR 35817). The Order mandates nationwide involuntary civil commitment of homeless individuals, conditions federal grants on local enforcement of anti-homeless ordinances, and rescinds support for evidence-based "housing first" policies. It directs the Attorney General and HHS Secretary to reverse judicial precedents and terminate consent decrees that impede forced institutionalization, requires data sharing between federal agencies and law enforcement, and authorizes emergency funding for encampment removals while prohibiting harm-reduction programs.

### 47. National Scope and Class Impact

48. According to HUD's 2024 Annual Homelessness Assessment Report, at least

771,000 people experienced homelessness on a single night in January 2024, with

an estimated 650,000–771,000 individuals subject to the Order's civil-

commitment mandates. The Order disproportionately targets protected classes:

persons with disabilities (over 40% of the homeless population), BIPOC

individuals (approximately 40% of unhoused despite 13% of the general

population), families with minor children (nearly 150,000 children counted), and

veterans (approximately 33,000 experiencing homelessness).

**49. Plaintiff's Background and Status**

50. Plaintiff, John Mimosa Marks, is a visibly disabled, unhoused resident of

Oakland, California, and founder of a nonprofit dedicated to homeless advocacy.

Unhoused since 2020 due to illness and cascading socioeconomic crises, Plaintiff

currently resides in a horse trailer on land in Oakland, CA (location redacted for

fear of retaliation).

51. Plaintiff lives with diagnosed disabilities—including PTSD—and a history of

involuntary psychiatric detention pursuant to Cal. Welf. & Inst. {WIC] §5150. In

addition, Plaintiff suffers from multiple complex and chronic medical conditions:

epilepsy, major depressive disorder, COPD, hypertension, and a surgically

implanted ventriculoperitoneal (VP) shunt for neurological drainage, requiring

regular monitoring and periodic surgical revision by neurosurgical specialists.

These serious conditions materially increase Plaintiff's risk of medical deterioration, harm, and potentially death if subjected to involuntary institutionalization—particularly in any facility lacking individualized medical care, rescue therapies for seizures, management of depression or hypertension, or shunt revision and monitoring capabilities. Involuntary detention in nonmedical or punitive settings would substantially increase Plaintiff's risk of shunt blockage, uncontrolled seizures, hypertensive crisis, respiratory failure, and psychiatric decompensation. See *Olmstead v. L.C.*, 527 U.S. 581, 599–600 (1999) ("confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment"); see also Americans with Disabilities Act § 202, 42 U.S.C. § 12132; Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794.

52. Plaintiff's life-threatening risk is not speculative but supported by documented medical necessity for individualized, specialized care in a community setting, which institutional providers frequently lack. See *Olmstead*, 527 U.S. at 607 ("States are required to provide community-based treatment for persons with mental disabilities when such treatment is appropriate, the affected persons do not oppose it, and the treatment can be reasonably accommodated.").

53. High public visibility as a candidate for office, nonprofit leader, and outspoken critic of punitive homeless policies further heighten Plaintiff's vulnerability under the new federal mandate. Plaintiff has also pursued a political science degree with the goal of participating in the Law Office Study Program, and operated a business repairing electric scooters for major micromobility providers—both during periods of housing instability—further demonstrating Plaintiff's competency, community ties, and desire for civic engagement.

54. Federal and Statutory Citations for Section

**55. Due Process and Federal Civil Rights:**

56. U.S. Const. amend. XIV, § 1 (Due Process and Equal Protection Clauses)

57. 42 U.S.C. § 1983 (Civil action for deprivation of rights under color of law)

58. Disability Rights Statutes:

59. Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–12134 (prohibiting discrimination by public entities)

60. Americans with Disabilities Act § 202, 42 U.S.C. § 12132 (public entity may not exclude or deny benefits on the basis of disability)

61. Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794 (prohibition of discrimination under any program or activity receiving federal financial

assistance)

62. Relevant Supreme Court Precedent:

63. *Olmstead*, 527 U.S. at 599–600, 607 (institutionalization may constitute
discrimination under the ADA; states must provide community-based treatment
when appropriate and reasonable)

64. Recent Living Conditions

65. Plaintiff's encampment was recently the site of a violent armed robbery in which
residents were held at gunpoint. Plaintiff's vehicle was also stolen and later
personally recovered. Despite these substantial risks and Plaintiff's repeated
exposure to harm, local authorities have failed to provide meaningful protection
or assistance. Instead, Plaintiff continues to experience ongoing harassment,
threats of displacement, and targeted official surveillance. Against this backdrop
of violence and insecurity, the threatened enforcement of the federal Executive
Order—authorizing involuntary civil commitment of unhoused individuals—
poses a new and credible danger to Plaintiff's liberty, safety, and well-being. The
pattern of state and local indifference, when combined with the sweeping
enforcement powers mandated by the Executive Order, creates a real and
imminent risk that Plaintiff will face unconstitutional detention, medical neglect,
and retaliation for protected advocacy, in violation of the Due Process and Equal
Protection Clauses of the Fourteenth Amendment to the United States

Constitution (U.S. Const. amend. XIV, § 1), the First Amendment (U.S. Const. amend. I), the Americans with Disabilities Act (42 U.S.C. §§ 12131–12134), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and related civil rights protections (42 U.S.C. § 1983).

66. Federal and Statutory Citations for Section

**67. Due Process, Equal Protection, and Federal Civil Rights:**

68. U.S. Const. amend. XIV, § 1 ("No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.")

69. 42 U.S.C. § 1983 (Civil action for deprivation of rights under color of law)

70. First Amendment—Protection Against Retaliation for Advocacy:

71. U.S. Const. amend. I

72. Disability Rights Statutes:

73. Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–12134 (prohibition of discrimination by public entities)

74. Rehabilitation Act of 1973, Section 504: 29 U.S.C. § 794 (prohibition of discrimination under any program or activity receiving federal financial assistance)

**75. Additional Federal Authority:**

76. Fair Housing Act: 42 U.S.C. § 3604 (prohibiting discrimination in the provision of housing)

**77. Evictions from Major Encampments in J.G.G. v. Trump, D.D.C. Mar. 16**

78. In J.G.G. v. Trump, D.D.C. Mar. 16, Plaintiff was twice forcibly evicted from large-scale encampments—Mosswood Park and "Tent City" on East 12th Street and 14th Avenue—by local authorities. These removals exemplify the type of government conduct that the federal Executive Order threatens to perpetuate nationwide, thus raising profound concerns under the Due Process Clause of the Fourteenth Amendment to the United States Constitution (U.S. Const. amend. XIV, § 1) and 42 U.S.C. § 1983.

79. During these evictions, Plaintiff declined city-offered housing because those placements were administered by the Housing Consortium of the East Bay (HCEB), an entity Plaintiff has publicly accused of corruption and retaliatory practices. Contrary to city officials' representations, Plaintiff and numerous other unhoused residents were not provided legitimate or voluntary housing alternatives. Instead, available placements were conditioned upon accessing services through known retaliatory actors, and prior placements coordinated by

such entities exposed Plaintiff to theft, surveillance, abuse, and medical neglect. Plaintiff's refusal to accept such placements was thus a matter of preserving safety and autonomy, not noncompliance with any lawful requirement, and any contrary characterization threatens Plaintiff's rights to procedural and substantive due process under U.S. Const. amend. XIV, § 1 and 42 U.S.C. § 1983.

80. As a direct consequence of Plaintiff's public advocacy, documentary reporting, and criticism of local partners, Plaintiff experienced retaliatory exclusion from municipal services, was singled out for more aggressive enforcement action during site closures, and endured further loss of shelter. These practices are emblematic of a pattern of harm, discrimination, and retaliation that is further prohibited by Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12134 (prohibiting discrimination on the basis of disability in public services), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (prohibiting exclusion from participation in or denial of benefits from federally funded programs solely by reason of disability).

81. Such government actions—taken under color of state law, motivated by Plaintiff's exercise of protected First Amendment rights, and involving coercive or punitive practices against disabled individuals—violate Plaintiff's rights to equal protection and freedom from retaliation (U.S. Const. amend. I, XIV; 42 U.S.C. §

1983), and further implicate the statutory rights afforded to disabled persons under federal law. These incidents establish not merely a factual basis for standing but also a credible, imminent threat of future constitutional and statutory violations should the challenged Executive Order be implemented.

**82. Federal and Statutory Citations for Section**

**83. Due Process and Federal Civil Rights Authority:**

84. U.S. Const. amend. XIV, § 1 ("No State shall... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.")

85. 42 U.S.C. § 1983 (Civil action for deprivation of rights under color of law)

86. Disability Rights Statutes:

87. Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–12134 (prohibition of discrimination by public entities)

88. Rehabilitation Act of 1973, Section 504: 29 U.S.C. § 794 (prohibition of discrimination under any program or activity receiving federal financial assistance)

89. Additional Relevant Statutes and Authority:

90. U.S. Const. amend. I (protection against retaliation for engaging in protected speech and advocacy)

91. Fair Housing Act: 42 U.S.C. § 3604 (prohibiting discrimination in the provision of housing)

92. U.S. Const. amend. V (Due Process Clause, applicable to federal actors)

**93. Pattern of Criminalization and Systemic Neglect**

94. 2020: After months in the ICU for COVID-19 and meningitis, Plaintiff lost stable housing. Previously housed in a high-income setting and engaged in homelessness-related contracts, Plaintiff's trajectory shifted dramatically when medical crises resulted in homelessness, a status that is disproportionately criminalized and stigmatized in violation of key federal civil rights protections. See *Robinson v. California*, 370 U.S. 660, 666–67 (1962) (holding the criminalization of status, such as narcotics addiction, is prohibited by the Eighth Amendment as incorporated by the Fourteenth).

95. 2021–2022: Plaintiff, a medically vulnerable unsheltered individual, was admitted to the "Safer Ground" hotel program. During this period, Plaintiff was sexually assaulted by another resident and repeatedly stalked, but when these incidents

were reported, staff dismissed them as "hearsay" and law enforcement was

unresponsive. Another female participant who defended herself was arrested.

These failures to protect vulnerable disabled persons, combined with system

inertia, are actionable under Title II of the Americans with Disabilities Act, 42

U.S.C. §§ 12131–12134, and the Rehabilitation Act, 29 U.S.C. § 794.

96. Throughout this period, Plaintiff was exposed to frequent vehicle break-ins and

harassment, with both law enforcement and program operators (Abode Services, a

recipient of public funds) refusing to take reasonable protective measures or

provide access to evidence. This deliberate indifference, failure to accommodate

disability-related needs, and lack of access to trauma care resulted in the

worsening of Plaintiff's posttraumatic stress disorder (PTSD), invoking the

protections of 42 U.S.C. § 12132 and 29 U.S.C. § 794(a).

97. Summer 2022: Plaintiff discovered that Abode Services, purportedly a 501(c)(3)

non-profit but believed to operate a shadow for-profit entity, was potentially

engaging in fraudulent activities to extract federal funds from the Department of

Housing and Urban Development (HUD) and was coercing residents into

unwanted placements. Such actions, if proven, implicate liability under the False

Claims Act, 31 U.S.C. §§ 3729–3733, and threaten the statutory rights of disabled

residents under federal law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 30

98. During this time, Plaintiff's name was fraudulently used in housing-related documents containing false information. Plaintiff was frequently threatened with forced "exit" from the program for refusing unsuitable placements—retaliatory conduct and denial of benefits strictly prohibited by the ADA and the Rehabilitation Act (42 U.S.C. § 12203; 29 U.S.C. § 794).

99. Late 2022: Plaintiff was illegally evicted from the Radisson hotel, despite having legal counsel and an agreement with a county official, resulting in hospitalization for physical and psychological distress (unrelated to a mental health hold). While hospitalized, Plaintiff's personal belongings were stolen—likely by program staff, who subsequently attempted to sell them back—followed by Plaintiff's vehicle being towed without consent and a non-consensual transfer to another program. Such acts may constitute deprivation of property rights without due process in violation of U.S. Const. amend. XIV, § 1.

100.    2022–2023: Plaintiff was assigned to a housing facility operated by "5 Keys," itself a nominal non-profit directly managed by the San Francisco Sheriff's Office for the purpose of placing civilians. After a change in leadership, Plaintiff, despite being considered a model resident, was subjected to punitive and carceral policies: residents were forced to surrender all personal belongings and

wear jail-issued clothing, conditions that may violate constitutional protections against cruel and unusual punishment and arbitrary deprivation of liberty. Plaintiff asserted statutory tenant rights under California law but was nevertheless evicted for leaving site one night to attend a concert and lost all belongings as a result.

101.    2023–J.G.G. v. Trump, D.D.C. Mar. 16: In the aftermath, Plaintiff suffered repeated armed robberies, assaults, and threats while under constant official surveillance and the persistent risk of displacement by local or state authorities. No meaningful police protection or disability-related accommodation was provided, further implicating the state's obligations under the ADA, the Rehabilitation Act, and the Fourteenth Amendment.

**102.    Federal and Statutory Citations for Section**

**103.    Due Process, Equal Protection, and Federal Civil Rights:**

104.    U.S. Const. amend. XIV, § 1 (Due Process and Equal Protection Clauses)

105.    42 U.S.C. § 1983 (Civil action for deprivation of rights under color of law)

106.    Disability Rights Statutes:

107.    Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–12134 (prohibition of discrimination by public entities)

108.    Americans with Disabilities Act § 202, 42 U.S.C. § 12132 (public entity may not exclude or deny benefits on the basis of disability)

109.    Americans with Disabilities Act § 503, 42 U.S.C. § 12203 (prohibition against retaliation and coercion)

110.    Rehabilitation Act of 1973, Section 504: 29 U.S.C. § 794 (prohibition of discrimination under any program or activity receiving federal financial assistance)

111.    Eighth Amendment/Anti-Criminalization:

112.    U.S. Const. amend. VIII (Cruel and Unusual Punishments Clause, as incorporated by the Fourteenth Amendment)

113.    *Robinson*, 370 U.S. at 666–67 (criminalizing a person's status as a violation of the Eighth and Fourteenth Amendments)

114.    Federal Protections Against Fraud and Property Deprivation:

115.    False Claims Act, 31 U.S.C. §§ 3729–3733 (federal actions for fraud involving government funds and programs)

**116.    Vulnerability in Encampment Settings**

117.     Plaintiff previously resided at the Wood Street encampment in West Oakland, one of the largest and most heavily surveilled unhoused communities in California. Plaintiff was compelled to leave after receiving credible threats of violence directed at Plaintiff's service animal, Molly, protected as an accommodation under federal disability law. Despite Plaintiff's prior reporting of documented safety concerns, neither city nor program officials intervened or provided meaningful protection or accommodation as required by law. This involuntary displacement, resulting from unmitigated risks and lack of effective response, further demonstrates Plaintiff's ongoing vulnerability to state neglect and coercive conditions, in violation of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and Plaintiff's right to equal protection and due process under the Fourteenth Amendment to the United States Constitution (U.S. Const. amend. XIV, § 1).

118.     Such failure by state actors to provide reasonable accommodation—including safety for a service animal—is further actionable as discrimination and deprivation of meaningful access to public services under federal law. See 42 U.S.C. § 12132; 29 U.S.C. § 794; see also *Olmstead*, 527 U.S. at 597–603 (integration mandate and community-based accommodations are required where appropriate).

**119.**     **Federal and Statutory Citations for Section**

**120.**     **Disability Rights and Accommodations:**

121.     Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–

12134 (prohibiting discrimination and requiring public entities to accommodate

disabilities)

122.     Americans with Disabilities Act § 202, 42 U.S.C. § 12132 (no qualified

individual with a disability shall be excluded from participation in or denied the

benefits of the services, programs, or activities of a public entity)

123.     Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794 (prohibiting

disability discrimination in federally funded programs)

124.     *Olmstead*, 527 U.S. at 597–603 (states required to provide services in the

most integrated setting appropriate to the needs of qualified individuals with

disabilities)

125.     Equal Protection and Due Process:

126.     U.S. Const. amend. XIV, § 1 (Due Process and Equal Protection Clauses)

**127.**     **Political Advocacy and Retaliatory Risk**

128.     Despite a backdrop of constant instability and adversity, Plaintiff actively

organizes fellow unhoused residents, operates a nonprofit dedicated to advocacy,

and engages persistently in public advocacy activities, including running for mayor. Plaintiff's prominent political profile and open criticism of local and federal homeless policy have led to targeted retaliation, exclusion from services, and government surveillance. Such acts—including denial of access to services and escalated enforcement directed at Plaintiff in response to public advocacy— constitute retaliation and create a chilling effect on the exercise of protected advocacy and free speech. The loss or deterrence of First Amendment rights, even briefly, constitutes irreparable injury at the core of constitutional vindication. *See* U.S. Const. amend. I; *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

129.    Plaintiff's criticisms have particularly targeted the Housing Consortium of the East Bay (HCEB), a nonprofit recipient of substantial public funds. Through public testimony at official meetings, direct engagement with elected officials, and documentary reporting, Plaintiff has repeatedly accused HCEB of corruption, enabling violence, and retaliatory practices. These activities have made Plaintiff a conspicuous and vulnerable target for retaliatory exclusion and enforcement. The actions taken against Plaintiff—including forced evictions, delegating Plaintiff's case to providers previously accused of such practices, and exclusionary service tactics—mirror the very forms of coercion that the federal Executive Order seeks to nationalize, thus magnifying both the established pattern of harm and the

imminent threat at issue. The Executive Order's application is not limited to those encountered in public space, but extends to those singled out because of their advocacy, disability status, or involvement with service providers, further multiplying the risk of discrimination and pretextual punitive detention. See U.S. Const. amend. XIV, § 1 (Equal Protection Clause); 42 U.S.C. § 1983.

130.    The Executive Order—issued by Defendant Donald J. Trump, whose public record includes documented instances of retaliating against political critics and adversaries—heightens the credible risk that Plaintiff will face selective or vindictive enforcement specifically because of Plaintiff's advocacy, exercise of free speech, litigation efforts, and political activity. See U.S. Const. amend. I, XIV; 42 U.S.C. § 1983.

**131.    Federal and Statutory Citations for Section**

**132.    First Amendment—Protected Advocacy and Anti-Retaliation:**

133.    U.S. Const. amend. I (prohibiting government retaliation and chilling of protected speech)

134.    *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

135.    Due Process, Equal Protection, and Civil Rights Remedies:

136.    U.S. Const. amend. XIV, § 1 (Equal Protection and Due Process Clauses)

137.    42 U.S.C. § 1983 (remedy for deprivation of rights under color of law)

**138.    Disability Rights:**

139.    Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–12134 (prohibiting discrimination and retaliation based on disability in services by public entities)

140.    Rehabilitation Act of 1973, Section 504: 29 U.S.C. § 794

**141.    Retaliation and Program-Related Protections:**

142.    Americans with Disabilities Act § 503, 42 U.S.C. § 12203 (prohibiting retaliation and coercion against those advocating for rights under the ADA)

143.    42 U.S.C. § 3604(f) (Fair Housing Act – protections regarding disability and retaliation in housing contexts)

144.    Systemic Disparate Impact and Federalization of Local Harm

145.    Plaintiff's experiences are not unique, but instead exemplify broader national data and well-documented trends demonstrating that forced displacement, criminalization, and coerced institutionalization of unhoused populations have a disproportionately severe impact on individuals with disabilities, those with complex medical needs, Black, Indigenous, and People of Color (BIPOC), and other marginalized groups. These blanket policies—

particularly those that single out people with mental disabilities—are subject to heightened scrutiny under the Equal Protection Clause. See *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–50 (1985) (requiring heightened scrutiny for government actions targeting people with mental disabilities).

146.     The challenged Executive Order, by mandating and federalizing such enforcement strategies on a national scale, threatens to codify and intensify these disparate harms, overriding and worsening patterns long evidenced in jurisdictions such as Oakland. This action directly implicates and is proscribed by a constellation of federal disability and civil rights statutes, including the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Fair Housing Act, 42 U.S.C. §§ 3601–3619. See also *Olmstead*, 527 U.S. at 607 ("States are required to provide community-based treatment for persons with mental disabilities when such treatment is appropriate, the affected persons do not oppose it, and the treatment can be reasonably accommodated.").

147.     Plaintiff's lived experience—marked by coercion, repeated displacement, institutionalization, and systemic exclusion—mirrors the vulnerabilities that this Executive Order seeks to entrench at the federal level. If implemented, these policies will not only re-traumatize Plaintiff, but will imminently place similarly situated unhoused and disabled individuals nationwide at heightened risk of unconstitutional detention, medical neglect, and targeted retaliation, in direct violation of the protections afforded by the Constitution and federal law.

**148.** **Federal and Statutory Citations for Section**

**149.** **Equal Protection, Due Process, and Civil Rights:**

150. U.S. Const. amend. XIV, § 1 (Equal Protection and Due Process Clauses)

151. 42 U.S.C. § 1983 (Civil action for deprivation of rights under color of law)

**152.** **Disability Rights Statutes:**

153. Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213 (prohibiting discrimination by public entities and mandating reasonable accommodations)

154. ADA § 202, 42 U.S.C. § 12132 (prohibiting exclusion from participation in, or denial of benefits of, services, programs, or activities of a public entity due to disability)

155. Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794 (prohibiting discrimination by recipients of federal financial assistance, including local governments)

156. Fair Housing Act, 42 U.S.C. §§ 3601–3619 (prohibiting housing discrimination based on disability or race)

**157.** **Key Supreme Court Authority:**

158. *City of Cleburne*, 473 U.S. at 446–50 (requiring heightened scrutiny for facially discriminatory government policies impacting those with mental

disabilities)

159.     *Olmstead*, 527 U.S. at 607 (mandating community-based services for

persons with disabilities when appropriate, and prohibiting unnecessary

institutionalization as discrimination)

**160.        Credible and Imminent Threat Under the Executive Order**

161.     The July 24th, 2025 Executive Order, mandating nationwide involuntary

civil commitment of unhoused individuals, presents a substantial and imminent

threat: Plaintiff's prior mental health holds, chronic and complex medical

conditions, and public profile make Plaintiff an obvious target under the EO's

broad and ambiguous enforcement authority.

162.     Institutionalization in a facility lacking capacity to monitor and treat

Plaintiff's VP shunt, seizures, and other complex needs poses a life-threatening

danger. The risk of retaliation for advocacy and the recurrence of programmatic

abuse is further intensified by the federalization of punitive local practices.

163.     Given Plaintiff's prior 5150 designation, public visibility, and critical

stance toward law enforcement and housing providers, the Executive Order

creates a credible risk that Plaintiff's disability history will be misused as pretext

for civil commitment, in retaliation for protected speech and dissent.

164.     This credible risk of indefinite, improper civil commitment and loss of
liberty without rigorous procedural safeguards directly implicates fundamental
constitutional protections articulated in *O'Connor v. Donaldson*, 422 U.S. 563
(1975) ("A State cannot constitutionally confine...a non-dangerous individual who
is capable of surviving safely in freedom."), *Addington v. Texas*, 441 U.S. 418
(1979) (civil commitment requires clear and convincing evidence of
dangerousness), and *Foucha v. Louisiana*, 504 U.S. 71 (1992) (commitment must
end when justification ceases).

**165.     Federal and Statutory Citations for Section**

**166.     First Amendment—Protected Advocacy and Anti-Retaliation:**

167.     U.S. Const. amend. I (prohibiting government retaliation and chilling of
protected speech)

168.     *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even
minimal periods of time, unquestionably constitutes irreparable injury.")

169.     Due Process, Equal Protection, and Civil Rights Remedies:

170.     U.S. Const. amend. XIV, § 1 (Equal Protection and Due Process Clauses)

171.     42 U.S.C. § 1983 (remedy for deprivation of rights under color of law)

**172.**     **Disability Rights:**

173.     Americans with Disabilities Act (ADA), Title II: 42 U.S.C. §§ 12131–

12134 (prohibiting discrimination and retaliation based on disability in services

by public entities)

174.     Rehabilitation Act of 1973, Section 504: 29 U.S.C. § 794

**175.**     **Retaliation and Program-Related Protections:**

176.     Americans with Disabilities Act § 503, 42 U.S.C. § 12203 (prohibiting

retaliation and coercion against those advocating for rights under the ADA)

177.     42 U.S.C. § 3604(f) (Fair Housing Act – protections regarding disability

and retaliation in housing contexts)

**178.**     **General Authority**

179.     This action is brought pursuant to the Constitution and laws of the United

States, including but not limited to: the Fifth and Fourteenth Amendments (Due

Process and Equal Protection Clauses), U.S. Const. amends. V, XIV; the

Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., particularly § 12132

(Title II); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the

Fair Housing Act, 42 U.S.C. §§ 3601, 3604. Plaintiff invokes the Declaratory

Judgment Act, 28 U.S.C. §§ 2201–2202, and seeks injunctive relief under the general equitable powers of this Court, as well as 42 U.S.C. § 1983. This complaint is grounded in controlling Supreme Court and Ninth Circuit precedent, including but not limited to: *O'Connor*, 422 U.S. [Page], 563 ([Year]); *Addington*, 441 U.S. at 418; *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Jackson v. Indiana*, 406 U.S. 715 (1972); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985); *Olmstead*, 527 U.S. at 581; *Elrod*, 427 U.S. at 347; *Robinson*, 370 U.S. at 660; and *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024).

**180.    SUPPLEMENTAL FACTS REGARDING RECENT FEDERAL ACTIONS IN WASHINGTON, DC**

181.    Plaintiff hereby incorporates by reference all allegations contained in the Verified Complaint and states the following additional facts.

182.    On August 10 and 11, 2025, President Donald J. Trump publicly announced and effectuated an increased federal law enforcement presence in Washington, D.C., including the deployment of approximately 120 FBI agents to conduct nighttime patrols explicitly targeted at enforcing policies against homeless individuals.

183.    President Trump publicly declared that homeless persons in Washington, D.C., "must move out, IMMEDIATELY," and further stated that accommodations for these persons would only be provided "far from the Capital," demonstrating a federal plan for forcible relocation and detention rather than community-based housing solutions.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 44

184.    During his press conference yesterday, August 11, 2025, President Trump further asserted that federal law enforcement and local police have "the authority to do whatever the hell they want," including breaking into homes and encampments, arresting individuals, and conducting searches without warrants or due process, effectively nullifying local authority and legal safeguards.

185.    These recent federal actions, including deployment of aggressive law enforcement and explicit statements about unlimited police power, constitute part of a broader federal initiative aimed at controlling homelessness and public crime in Washington, D.C., with similar threats implied for Oakland, California, and other jurisdictions.

186.    These developments are directly linked to Executive Order No. 14321, titled "Ending Crime and Disorder on America's Streets," which mandates nationwide involuntary civil commitment of homeless individuals without proper procedural safeguards, incentivizes aggressive enforcement strategies, and rescinds evidence-based "housing first" policies.

187.    The pattern of federal and local deployment of law enforcement, coupled with open threats to use force "to do whatever they want," signifies an imminent threat that Plaintiff and similarly situated individuals face detention, forced displacement, retaliation, and deprivation of rights—especially given the already heightened vulnerability of homeless populations in Oakland.

188.    The recent declarations by President Trump and federal officials make clear that the scope and severity of enforcement actions are likely to escalate, further risking violations of constitutional protections, including due process

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 45

rights under the Fourteenth Amendment, protections against illegal searches and

seizures, and protections from retaliation for protected advocacy.

189.      These facts underscore the urgent and worsening threat posed by federal

initiatives and statements, and the need for immediate judicial intervention to

prevent imminent harm to Plaintiff and others similarly situated.

**190.      PLAINTIFF SUBMITS THE FOLLOWING EXHIBITS AND
SWORN DECLARATIONS IN SUPPORT OF THE EMERGENCY EX
PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND
THE VERIFIED COMPLAINT. ALL DECLARATIONS ARE MADE
UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746.**

**191.      Exhibits:**

192.      Exhibits 1 & 2: Video recordings personally taken by Plaintiff of the City
of Oakland's seizure and destruction of all property belonging to residents of a
homeless encampment, including the summary destruction of a motorcycle, RV,
and all personal effects, without due process protections under the Fourteenth
Amendment, despite the City's public claim that such property is stored for six
months. Such events occur on a daily basis.

193.      Exhibit 3: Video recording showing Plaintiff's own belongings being run
over and destroyed by a makeshift bulldozer wrapped in barbed wire, used by the
City and State during evictions of unhoused individuals. The City has previously
settled litigation arising from the alleged death of an individual run over by this
same type of machine.

194.      Exhibit 4: Plaintiff's health records from UCSF Medical Center, covering
treatment from 2013 to the present. Due to the highly private nature of these
records, combined with Plaintiff's limited access to printing, paper, ink, and
electricity as a homeless individual, this exhibit is provided in digital form only
(USB) for the Court's review.

195.     Exhibit 5: Plaintiff's health records from Lifelong Medical Care, covering treatment from 2020 to the present. For the same privacy and access reasons as Exhibit 4, this exhibit is submitted in digital form only. Plaintiff has also received medical treatment from other hospitals and clinics, including Stanford Medical and UCLA Medical, but cannot presently obtain those records without appearing in person.

196.     Exhibit 6: Video showing a former City- and State-sanctioned housing facility for residents displaced from closed encampments. The facility was abandoned months or years earlier, yet public funds continued to be paid as if it were occupied. Federal dollars funded this facility, as with all such encampment-resolution housing programs. Entire filing cabinets containing homeless clients' files were left unsecured and ransacked, creating a substantial risk of identity theft.

197.     Exhibit 7: Video recording of an approximately 80-year-old man, visibly disabled and using a walker, pleading for time to remove his possessions before the City and State, acting with federal "encampment resolution" funds, destroyed them. Despite the man's cooperation and urgent medical vulnerability, no assistance was offered. Plaintiff personally intervened to stand in front of the RV, alongside other advocates, until a tow truck the man had arranged arrived to move it. This event was life-altering for Plaintiff and emblematic of the irreparable harm threatened by EO 14321.

198.     Exhibit 8: The New York Times, August 11, 2025, "Trump Orders Surge of Law Enforcement in Washington, D.C.".

199.     Exhibit 9: Newsweek, August 10, 2025, "Trump Sends 120 FBI Agents to DC Amid Crime Crackdown Threat".

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 47

200.    Exhibit 10: Reuters coverage transcript excerpt reported by The Daily

Beast, August 10, 2025, "Trump's Tells DC Homeless to 'Move Out

IMMEDIATELY'".

201.    Exhibit 11: The Washington Post, August 10-11, 2025, "Trump is

promising new steps to tackle homelessness and crime in Washington".

202.    Exhibit 12: Official Presidential Executive Order No. 14321, "Ending

Crime and Disorder on America's Streets," July 24, 2025, 90 Fed. Reg. ___

(2025), mandating involuntary civil commitment of homeless individuals

nationwide.


203.    Note: Plaintiff has additional relevant evidentiary items in his possession
that will be submitted to the Court as they are located and sorted from other
materials. The PDFs and Word documents labeled in this electronic submission
are  digital copies of the printed filings submitted today.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                         - 48

# CLAIMS

### 204.      PROCEDURAL DUE PROCESS VIOLATIONS

205.      (Against All Defendants)

206.      Violations of Procedural Due Process Under the Fifth and Fourteenth
Amendments to the United States Constitution and 42 U.S.C. § 1983

### 207.      Legal Standard

208.      The Fifth Amendment guarantees that "[n]o person shall … be deprived of
life, liberty, or property, without due process of law." U.S. Const. amend. V. The
Fourteenth Amendment extends this prohibition to state and local action. U.S.
Const. amend. XIV, § 1.

### 209.      Constitutional Foundation:

210.      The Due Process Clauses of the Fifth and Fourteenth Amendments to the
United States Constitution prohibit the federal and state governments from
depriving any person of "life, liberty, or property, without due process of law."
U.S. Const. amend. V; U.S. Const. amend. XIV, § 1.

211.    **Civil Commitment Due Process Requirements:**

212.    The Supreme Court has established stringent procedural safeguards for involuntary civil commitment: Involuntary civil commitment is a "massive curtailment of liberty" requiring "the procedural protections of due process." *Foucha*, 504 U.S. at 80.

213.    **Burden of Proof Standard***: "Addington v. Texas*, 441 U.S. 418, 433 (1979), established that due process requires the state to justify civil commitment by 'clear and convincing evidence'—a standard higher than the preponderance of evidence used in typical civil proceedings but lower than the beyond-a-reasonable-doubt standard in criminal cases."

214.    **Substantive Limitations***: O'Connor v. Donaldson*, 422 U.S. 563 (1975) held that '[a] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.'"

215.    **Procedural Requirements:** Procedural Safeguards for Civil Commitment

216.     The Supreme Court has identified minimum procedures for constitutionally valid civil commitment:

217.     a. Clear and Convincing Evidence: Addington v. Texas, 441 U.S. 418, 433 (1979) requires proof of dangerousness or inability to survive safely by clear and convincing evidence.

218.     b. O'Connor v. Donaldson, 422 U.S. 563, 575 (1975) prohibits confinement of nondangerous individuals capable of surviving safely in freedom.

219.     c. Procedural Protections: Commitment proceedings must provide (i) timely and adequate notice, (ii) a meaningful opportunity to be heard, (iii) right to counsel, (iv) right to present and cross-examine witnesses, and (v) independent judicial review. *Addington*, 441 U.S. at 425–433.

**220.     Federal Delegation Standards:**

221.     When Congress delegates authority to executive agencies, it must provide an "intelligible principle" to guide agency discretion. *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928). Executive orders that mandate state action without providing adequate federal procedural standards violate  the separation of powers, the nondelegation doctrine, and due process. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–588 (1952).

222.    Factual Background

**223.    Executive Order Mandates Without Adequate Safeguards:**

224.    The July 24th, 2025 Executive Order "Ending Crime and Disorder on America's Streets" mandates "civil commitment of individuals with mental illness who pose risks to themselves or the public or are living on the streets and cannot care for themselves in appropriate facilities for appropriate periods of time." 90 Fed. Reg. 35817,

**225.    Directive to Eliminate Existing Protections:**

226.    The Executive Order specifically directs the Attorney General to "seek, in appropriate cases, the reversal of Federal or State judicial precedents and the termination of consent decrees that impede the United States' policy of encouraging civil commitment." This explicitly targets established due process protections.

**227.    Absence of Federal Procedural Standards:**

228.    Despite mandating nationwide civil commitment, the Executive Order fails to establish any federal procedural standards equivalent to those required by Addington and Donaldson, including:

229.     No requirement for "clear and convincing evidence" standard

230.     No mandate for adequate legal representation

231.     No requirement for independent judicial review

232.     No limitations on duration of commitment

233.     No provisions for periodic review of continued necessity

**234.     Plaintiff's Specific Vulnerability:**

235.     Plaintiff faces imminent threat under this regime due to his prior 5150 hold, complex medical conditions requiring specialized care, and high-profile advocacy that makes him a likely target for enforcement. His medical complexity (VP shunt, epilepsy, COPD, hypertension) creates life-threatening risks if subjected to institutionalization without proper procedural safeguards.

**236.     Legal Analysis**

**237.     Violation of Addington Standards:**

238.     The Executive Order violates Addington v. Texas by mandating civil commitment without requiring the constitutionally mandated "clear and convincing evidence" standard. By directing reversal of judicial precedents that

enforce this standard, the Executive Order explicitly seeks to circumvent established due process requirements. [*Addington*, 441 U.S. at 418, *O'Connor*, 422 U.S. at 563, https://www.federalregister.gov/d/2025-14391]

**239.     Violation of Donaldson Protections:**

240.     The Executive Order's broad mandate to commit individuals "living on the streets and cannot care for themselves" violates O'Connor v. Donaldson by permitting commitment based solely on homelessness and perceived inability to care for oneself, without the required showing of dangerousness or incapacity to survive safely in freedom. [*Addington*, 441 U.S. at 418, Exec. Order No. 14321, 3 C.F.R. 35817 (J.G.G. v. Trump, D.D.C. Mar. 16)]

**241.     Improper Federal Delegation Without Standards:**

242.     The Executive Order delegates implementation to state and local authorities while simultaneously directing them to adopt "maximally flexible civil commitment" standards and to reverse existing judicial protections. This creates arbitrary enforcement patterns violating due process uniformity requirements. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

**243.     Ultra Vires Executive Action:**

244.     The Executive Order exceeds presidential authority by attempting to mandate state civil commitment procedures—traditionally a matter of state law—without congressional authorization and in direct contravention of established Supreme Court precedent. Recent federal court decisions have increasingly recognized ultra vires challenges where executive orders exceed constitutional bounds.

**245.     Conclusion**

246.     Defendants' implementation of the July 24th, 2025 Executive Order violates Plaintiff's rights to procedural due process under the Fifth and Fourteenth Amendments by: (1) mandating civil commitment without requiring constitutionally adequate procedural safeguards; (2) directing the elimination of existing due process protections established by Addington and Donaldson; (3) creating arbitrary delegation standards that permit inconsistent enforcement; and (4) exceeding federal executive authority over matters of state civil commitment law. These violations create an imminent threat of unconstitutional deprivation of Plaintiff's liberty interests and warrant immediate injunctive relief.

**247.     VIOLATIONS OF THE ADA INTEGRATION MANDATE & SECTION 504 OF THE REHABILITATION ACT**

248.     (Against All Defendants)

249.     Title of the Cause of Action

**250.     Violations of the Americans with Disabilities Act Integration Mandate, 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983**

**251.     Relevant Legal Standard**

**252.     Supreme Court Foundation:**

253.     The Supreme Court established in *Olmstead*, 527 U.S. at 607, that "states are required to provide community-based treatment for persons with mental disabilities when such treatment is appropriate, the affected persons do not oppose it, and the treatment can be reasonably accommodated." The Court held that "unjustified institutionalization of persons with mental disabilities constitutes discrimination under the ADA." Id. at 597.

**254.     ADA Integration Mandate:**

255.     Title II of the Americans with Disabilities Act requires that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28

C.F.R. § 35.130(d); 42 U.S.C. § 12132. The ADA defines discrimination to include the "denial of the benefits of the services, programs, or activities of a public entity" to qualified individuals with disabilities. 42 U.S.C. § 12132.

**256.        Section 504 Integration Requirements:**

257.        On May 9, 2024, the Department of Health and Human Services issued updated Section 504 regulations that took effect July 8, 2024, explicitly codifying the integration mandate: "All programs and services conducted by a covered entity must be provided in the most integrated setting that is appropriate for the needs of the person with a disability." 45 C.F.R. § 84.76(a). The regulations specify that entities cannot "provide greater or more favorable benefits in a segregated setting" or engage in "failure to provide community-based services that would lead to the potential risk of institutionalization." 45 C.F.R. § 84.76(b).

**258.        Strengthened Legal Standards:**

259.        In A.J.T. v. Osseo Area Schools, 603 U.S. ___ (2025), the Supreme Court unanimously held that ADA discrimination claims require only a showing of "deliberate indifference"—that the defendant "disregarded a strong likelihood that the challenged action would violate protected rights"—rejecting higher "bad faith or gross misjudgment" standards.

**260.**    **Factual Background**

**261.**    **Plaintiff's Community Integration Success:**

**262.**    Despite complex medical conditions and housing instability, Plaintiff has

demonstrated the ability to live successfully in the community. Plaintiff has

pursued higher education, operated a business, engaged in political advocacy, and

maintained community ties—all while managing serious medical conditions

including a VP shunt, epilepsy, COPD, hypertension, and PTSD.

**263.**    **Medical Necessity for Community-Based Care:**

**264.**    Plaintiff's complex medical conditions require specialized, individualized

care available only in community settings. Institutionalization would create life-

threatening risks including shunt blockage, uncontrolled seizures, hypertensive

crisis, and psychiatric decompensation. Plaintiff's medical needs exemplify the

Olmstead principle that community-based treatment is not only appropriate but

medically necessary.

**265.**    **History of Institutional Failures:**

**266.**    Plaintiff's prior forced placements in institutional and quasi-institutional

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    - 58

settings resulted in sexual assault, theft, medical neglect, and worsening PTSD—

demonstrating the inherent risks and inadequacy of segregated settings that the

integration mandate was designed to prevent.

**267.        Executive Order's Direct Assault on Integration Mandate:**

268.        The July 24th, 2025 Executive Order explicitly mandates "shifting

homeless individuals into long-term institutional settings" and directs federal

agencies to "seek, in appropriate cases, the reversal of Federal or State judicial

precedents and the termination of consent decrees that impede the United States'

policy of encouraging civil commitment." [90 Fed. Reg. 35817]

**269.        Legal Analysis**

270.        **The Executive Order Violates Olmstead's Integration Mandate:**

271.        The Executive Order directly contravenes Olmstead by mandating

institutionalization as the preferred federal policy, rather than requiring

community-based services in the most integrated setting. By explicitly seeking to

reverse Olmstead-protecting judicial precedents and consent decrees, the

Executive Order demonstrates deliberate indifference to established integration

rights. [Citations 44, 47]

**272.**      **Violation of Updated Section 504 Standards:**

273.      The Executive Order violates the May 2024 HHS Section 504 regulations

by: (1) providing "greater or more favorable benefits in a segregated setting"

through prioritized federal funding for institutionalization; (2) failing "to provide

community-based services that would lead to the potential risk of

institutionalization" by eliminating Housing First funding; and (3) creating

policies that "restrict an individual's access to the most integrated setting" by

mandating institutional placement. 45 C.F.R. § 84.76(b).

**274.**      **Deliberate Indifference Standard Met:**

275.      Under A.J.T. v. Osseo, Defendants' implementation of the Executive

Order constitutes deliberate indifference because they are proceeding despite the

strong likelihood—indeed, the certainty—that mandating institutionalization over

community-based services violates established ADA integration rights. The

explicit directive to overturn Olmstead-protecting precedents demonstrates

conscious disregard for integration mandates.

**276.**      **Individual and Systemic Violations:**

277.      The Executive Order creates both individual harm to Plaintiff (who faces

imminent institutionalization threatening his life and liberty) and systemic

violations affecting all disabled individuals at risk of segregation. Recent DOJ enforcement patterns from 2022-2024 show that integration mandate violations affecting entire systems are actionable under both individual and class-wide theories. [Citations 2, 4, 7]

**278.** **Conclusion**

279.    Defendants' implementation of the July 24th, 2025 Executive Order violates Plaintiff's rights under the ADA integration mandate and Section 504 of the Rehabilitation Act by: (1) mandating institutionalization over community-based services in direct contravention of Olmstead v. L.C.; (2) seeking to eliminate judicial precedents and consent decrees that protect integration rights; (3) eliminating federal funding for proven community-based programs like Housing First; (4) violating updated 2024 HHS Section 504 regulations requiring services in the most integrated setting; and (5) demonstrating deliberate indifference to Plaintiff's established right to receive services in the community rather than in segregated institutional settings. These violations create imminent threats to Plaintiff's life, liberty, and integration rights, warranting immediate injunctive relief.

**280.** **CAUSE OF ACTION: SUBSTANTIVE DUE PROCESS VIOLATIONS**

281.    (Against All Defendants)

282.    Title of the Cause of Action

**283.    Violations of Substantive Due Process Under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983**

284.    Relevant Legal Standard

285.    **Fundamental Liberty Interest Foundation:**

The Supreme Court has recognized that civil commitment constitutes a "massive curtailment of liberty" that triggers fundamental constitutional protections. As the Court established in *O'Connor*, 422 U.S. at 576, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."

286.    **"Shocks the Conscience" Standard:**

Substantive due process violations occur when government conduct "shocks the conscience" of the court. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Court held that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.

287.    **Context-Specific Analysis for Deliberate Government Policy:**

When government officials have "time to make unhurried judgments" and

"extended opportunities to do better," their conduct is evaluated under the "deliberate indifference" standard rather than requiring a "purpose to harm." *id.* at 851. Executive orders and deliberate policy decisions—as opposed to split-second law enforcement judgments—are subject to this more demanding scrutiny.

288.     **Civil Commitment Requires Medical Justification:**

The Second Circuit has recognized that in the context of involuntary civil commitment, decisions made "substantially below medical standards" can shock the conscience because "involuntary commitment for medical treatment demands a medical justification." *Bolmer v. Oliveira*, 594 F.3d 134, 144 (2d Cir. 2010). Such decisions constitute "an arbitrary exercise of government power with no reasonable justification." *Id.*

289.     **Strict Scrutiny for Fundamental Liberty Interests:**

Civil commitment implicates fundamental liberty interests subject to strict scrutiny. "*Civil commitment for any purpose constitutes a significant deprivation of liberty*" requiring the government to demonstrate that its actions are narrowly tailored to serve a compelling state interest. *Addington*, 441 U.S. at 425.

290.     **Factual Background**

291.     Executive Order's Arbitrary Civil Commitment Mandates:

The July 24th, 2025 Executive Order mandates nationwide involuntary civil commitment of homeless individuals based solely on their housing status and

perceived inability to care for themselves, without requiring findings of dangerousness or medical necessity. [Citations 2, 14, 16]

292.    **Explicit Rejection of Constitutional Protections:**

The Executive Order specifically directs federal agencies to "seek, in appropriate cases, the reversal of Federal or State judicial precedents and the termination of consent decrees that impede the United States' policy of encouraging civil commitment." This constitutes a deliberate attempt to eliminate established substantive due process protections.

293.    **Plaintiff's Demonstrated Capacity for Community Living:**

Despite complex medical conditions and housing instability, Plaintiff has repeatedly demonstrated the capacity to "survive safely in freedom" as required by *Donaldson*. Plaintiff has pursued higher education, operated a business, engaged in political advocacy, maintained community relationships, and managed serious medical conditions while living independently. Plaintiff's situation directly contradicts the Executive Order's presumption that homelessness alone justifies civil commitment.

294.    **Lack of Medical Justification:**

The Executive Order mandates civil commitment without requiring individualized medical assessments, professional medical recommendations, or findings that community-based treatment is inappropriate or unavailable—all fundamental requirements established by federal disability law and medical ethics standards.

295.    **Legal Analysis**

296.    **The Executive Order Violates *O'Connor v. Donaldson*:**

The Executive Order directly contravenes *Donaldson* by authorizing civil commitment of individuals who are not dangerous and are capable of surviving safely in freedom. Plaintiff's demonstrated ability to maintain community ties, pursue education and employment, and manage complex medical needs while unhoused establishes precisely the capacity for independent living that *Donaldson* protects. The Executive Order's blanket presumption that homelessness justifies civil commitment violates this fundamental constitutional protection.

297.    **The Executive Order "Shocks the Conscience":**

The Executive Order meets the *Lewis* standard for conscience-shocking conduct because: (1) it constitutes a deliberate policy decision made with full opportunity for reflection, not a split-second judgment; (2) it explicitly seeks to overturn established constitutional protections; (3) it mandates deprivation of liberty without medical justification or individualized assessment; and (4) it serves no legitimate government interest that cannot be achieved through less restrictive means. Under *Bolmer*, civil commitment decisions substantially below medical standards shock the conscience—the Executive Order goes further by eliminating medical standards entirely.

298.    **Arbitrary Exercise of Government Power:**

The Executive Order constitutes precisely the kind of arbitrary government action

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 65

that substantive due process prohibits. It authorizes massive deprivations of liberty based on housing status rather than dangerousness or medical necessity, eliminates individualized assessments, and explicitly rejects established constitutional safeguards. This arbitrary exercise of power lacks any reasonable relationship to legitimate government interests in public health or safety.

299.    **Fails Strict Scrutiny:**

The Executive Order cannot survive strict scrutiny because: (1) it is not narrowly tailored—it applies to all homeless individuals regardless of individual circumstances; (2) it does not serve a compelling government interest—public safety and health can be achieved through less restrictive community-based interventions; and (3) it eliminates rather than employs the least restrictive means of achieving any legitimate objective.

300.    **Conclusion**

301.    Defendants' implementation of the July 24th, 2025 Executive Order violates Plaintiff's substantive due process rights under the Fifth and Fourteenth Amendments by: (1) authorizing civil commitment of non-dangerous individuals capable of surviving safely in freedom, in direct violation of *O'Connor v. Donaldson*; (2) mandating deprivation of liberty through conduct that shocks the conscience under *County of Sacramento v. Lewis*; (3) eliminating medical justification requirements for civil commitment decisions; (4) creating arbitrary governmental power unrelated to legitimate state interests; and (5) failing to satisfy strict scrutiny review required for fundamental liberty deprivations. The

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                      - 66

Executive Order's explicit directive to overturn constitutional protections,

combined with its blanket authorization of commitment based on housing status

alone, constitutes the precise type of arbitrary governmental oppression that

substantive due process was designed to prevent.

**302.      CAUSE OF ACTION: EQUAL PROTECTION VIOLATIONS**

303.      (Against All Defendants)

304.      Title of the Cause of Action

**305.      Violations of the Equal Protection Clause of the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983**

306.      Relevant Legal Standard

307.      **Equal Protection Fundamental Principle:**

The Equal Protection Clause of the Fourteenth Amendment mandates that "no

State shall... deny to any person within its jurisdiction the equal protection of the

laws." U.S. Const. amend. XIV, § 1. The Fifth Amendment imposes identical

requirements on the federal government through the Due Process Clause. *Bolling*

*v. Sharpe*, 347 U.S. 497, 499 (1954).

*308.*      **Enhanced Rational Basis Review for Disability Classifications:**

While *City of Cleburne*, 473 U.S. at 446, held that disability classifications

receive rational basis review, the Court applied a more searching analysis—often

termed "rational basis with bite"—invalidating the law because it was "based on an irrational prejudice against the mentally retarded." Recent legal scholarship and case law recognize that disability discrimination often triggers enhanced scrutiny when it reflects "deliberate indifference" under the revised ADA standards. .

309.    **Animus-Based Discrimination Standard:**

Government actions motivated by "animus"—defined as a "bare desire to harm a politically unpopular group"—violate equal protection even under rational basis review. *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973). The Supreme Court has consistently held that "a classification of persons undertaken for its own sake" lacking any relationship to legitimate governmental purposes is impermissible. *Romer v. Evans*, 517 U.S. 620, 635 (1996).

310.    **Facially Neutral Laws with Discriminatory Purpose:**

Under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977), facially neutral laws violate equal protection when enacted with discriminatory intent, evidenced by factors including: (1) disparate impact on protected groups; (2) historical background of discrimination; (3) specific sequence of events leading to the challenged decision; (4) departures from normal procedures; and (5) legislative history revealing discriminatory purpose.

311.    **Status-Based Criminalization:**

*Robinson*, 370 U.S. at 666, established that criminalizing a person's status—such

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                                    - 68

as addiction or, by extension, homelessness—violates the Eighth and Fourteenth Amendments. Recent circuit court decisions have recognized that laws targeting homeless individuals for conduct inherent in their status raise serious equal protection concerns. *Martin v. City of Boise*, 902 F.3d 1031, 1048 (9th Cir. 2018).

312.    **Factual Background**

313.    **Executive Order's Discriminatory Classifications:**

The July 24th, 2025 Executive Order creates explicit classifications based on housing status and disability, mandating "civil commitment of individuals with mental illness who pose risks to themselves or the public or are living on the streets and cannot care for themselves." [Citations 16, 44] This facially distinguishes between housed and unhoused individuals, and between those with and without mental disabilities.

314.    **Disparate Impact on Protected Classes:**

The Executive Order disproportionately impacts: (1) persons with disabilities, who comprise over 40% of the homeless population; (2) BIPOC individuals, who represent 40% of homeless individuals despite being 13% of the general population; (3) LGBTQ+ individuals, who experience homelessness at disproportionate rates; and (4) veterans with service-connected disabilities. These are all groups entitled to heightened equal protection scrutiny or enhanced rational basis review.

315.    **Historical Pattern of Discrimination:**

The Executive Order continues a documented historical pattern of discrimination against homeless individuals through criminalization, institutionalization, and exclusion from public spaces—discrimination that recent legal scholarship has recognized as rooted in "animus" and class-based prejudice. [Citations 27, 31]

316.    **Evidence of Animus and Discriminatory Intent:**

The Executive Order's explicit directive to "seek, in appropriate cases, the reversal of Federal or State judicial precedents and the termination of consent decrees that impede the United States' policy of encouraging civil commitment" demonstrates animus toward established constitutional protections for homeless and disabled individuals. The Order's legislative history and implementation reveal a "bare desire to harm" these politically vulnerable groups.

317.    **Legal Analysis**

318.    **The Executive Order Fails Enhanced Rational Basis Review for Disability Discrimination:**

Under *Cleburne*, the Executive Order's blanket mandate for civil commitment of individuals with mental disabilities fails enhanced rational basis review because it is "based on an irrational prejudice" and unfounded stereotypes about disabled persons' capacity for community living. Plaintiff's demonstrated ability to live independently while managing complex medical conditions directly contradicts the Order's presumptions, making the classification arbitrary and constitutionally impermissible.

319.     **The Executive Order Reflects Unconstitutional Animus:**

Following *Moreno* and *Romer*, the Executive Order's explicit targeting of homeless individuals for institutionalization, combined with its directive to eliminate existing constitutional protections, constitutes a "bare desire to harm a politically unpopular group" that cannot satisfy even rational basis review. The Order's broad scope, disconnection from stated public safety goals, and targeting of established legal protections evidences the animus that triggers enhanced constitutional scrutiny.

320.     **The Executive Order Exhibits Discriminatory Intent Under Arlington Heights:**

The *Arlington Heights* factors demonstrate discriminatory intent: (1) disparate impact on protected classes (disabled, BIPOC, LGBTQ+); (2) historical background of discrimination against homeless individuals; (3) sequence of events following recent Supreme Court decisions limiting homeless rights; (4) departure from normal procedures by mandating federal civil commitment without state consultation; and (5) legislative history explicitly targeting constitutional protections for vulnerable groups.

321.     **The Executive Order Criminalizes Status in Violation of Robinson:**

Extending *Robinson v. California*, the Executive Order permits civil commitment based on housing status combined with perceived inability to care for oneself—essentially criminalizing the status of being homeless and disabled. This violates equal protection by creating legal consequences based on involuntary status rather

than voluntary conduct.

322.    **The Executive Order Lacks Rational Basis:**

Even under the most deferential rational basis review, the Executive Order fails because involuntary institutionalization of non-dangerous individuals serves no legitimate government interest and is not rationally related to public health or safety. Less restrictive, community-based alternatives are both more effective and constitutionally required under federal disability law.

323.    **Conclusion**

324.    Defendants' implementation of the July 24th, 2025 Executive Order violates Plaintiff's rights under the Equal Protection Clause of the Fifth and Fourteenth Amendments by: (1) creating arbitrary classifications between housed and unhoused individuals that fail enhanced rational basis review; (2) discriminating against persons with disabilities in violation of established constitutional protections; (3) reflecting unconstitutional animus toward politically vulnerable groups; (4) exhibiting discriminatory intent under the *Arlington Heights* factors through disparate impact on protected classes; (5) criminalizing status-based characteristics in violation of *Robinson v. California*; and (6) lacking any rational relationship to legitimate governmental objectives. The Executive Order's explicit directive to eliminate existing constitutional protections, combined with its targeting of homeless and disabled individuals for institutionalization, constitutes precisely the kind of class-based discrimination that the Equal Protection Clause prohibits.

325.    **5. CAUSE OF ACTION: ULTRA VIRES EXECUTIVE ACTION EXCEEDING CONSTITUTIONAL AND STATUTORY AUTHORITY**

326.    (Against All Defendants)

327.    Title of the Cause of Action

328.    **Ultra Vires Executive Action in Violation of Separation of Powers Under Article I, Section 1; Article II, Section 3; and the Tenth Amendment to the United States Constitution, and 42 U.S.C. § 1983**

329.    Relevant Legal Standard

330.    **Constitutional Foundation for Separation of Powers:**

The Constitution vests "[a]all legislative Powers" in Congress (U.S. Const. art. I, § 1), grants the President authority to "take Care that the Laws be faithfully executed" (U.S. Const. art. II, § 3), and reserves to states all powers "not delegated to the United States by the Constitution" (U.S. Const. amend. X). Executive orders that exceed these constitutional boundaries are ultra vires and invalid.

331.    **The Youngstown Framework for Presidential Power:**

In *Youngstown Sheet & Tube Co.*, 343 U.S. at 579, Justice Robert Jackson's controlling concurrence established a three-part framework for analyzing presidential authority: (1) Presidential power is at its "maximum" when acting

pursuant to express or implied congressional authorization; (2) Presidential power exists in a "zone of twilight" when Congress has neither granted nor denied authority; and (3) Presidential power is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress." *Id.* at 635-637. In the third category, presidential action "can be supported only by any remainder of executive power after subtraction of such powers as Congress may have over the subject." *Id.* at 637.

332.     **Civil Commitment as Exclusively State Authority:**

The Supreme Court has recognized that civil commitment authority belongs to the states under their traditional police and *parens patriae* powers. In *United States v. Lopez*, 514 U.S. 549, 566 (1995), the Court noted that "the federal government has no general police or *parens patriae* power." Federal courts have consistently held that "the power for civil commitment of sex offenders is held by the state and that Congress does not have the power to grant this authority to the federal government." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012). As the Substance Abuse and Mental Health Services Administration confirms, "[s]tandards and procedures for commitment are provided by state law, in every state."

333.     **Ultra Vires Review Standard:**

Ultra vires review examines whether government officials have acted "beyond the scope of their legal authority or in violation of the law." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Courts must determine "the extent of

the [official's] delegated authority and then determine whether the [official] has

acted within that authority." *Professionals & Patients for Customized Care v.*

*Shalala*, 56 F.3d 592, 595 (5th Cir. 1995). Recent precedent confirms that "*ultra*

*vires* review is nonetheless strong enough to check the arbitrary decision-making"

by executive officials.

**334.**    **Factual Background**

**335.**    **Executive Order Exceeds Federal Authority:**

The July 24th, 2025 Executive Order 14321 "Ending Crime and Disorder on

America's Streets https://www.govinfo.gov/content/pkg/FR-2025-07-

29/pdf/2025.pdf. " mandates "civil commitment of individuals with mental illness

who pose risks to themselves or the public or are living on the streets and cannot

care for themselves." This directive attempts to federalize what has traditionally

been an exclusively state function under state police powers.

**336.**    **Congressional Rejection of Federal Civil Commitment Expansion:**

Congress has specifically rejected federal civil commitment expansion. When

considering the Taft-Hartley Act and other legislation, Congress has consistently

declined to grant the executive branch broad civil commitment authority. Recent

federal court decisions striking down attempted federal civil commitment statutes

demonstrate ongoing congressional and judicial recognition that such authority

belongs to states.

**337.**    **Direct Conflict with Congressional Intent:**

The Executive Order directly contradicts congressional policy embodied in multiple federal statutes, including: the Americans with Disabilities Act's integration mandate (42 U.S.C. §§ 12101 et seq.), the Rehabilitation Act (29 U.S.C. § 794), Housing First policies in federal appropriations, and the Community Mental Health Act's community-based treatment requirements. The Order explicitly seeks to "reverse Federal or State judicial precedents" that protect these congressionally mandated rights.

338.     **Absence of Constitutional or Statutory Authorization:**

The Executive Order cites no specific constitutional provision or congressional statute authorizing federal civil commitment of homeless individuals. The President cannot point to any enumerated power in Article II that grants authority over state civil commitment proceedings or state police powers.

**339.     Legal Analysis**

340.     Presidential Power at Its "Lowest Ebb" Under Youngstown:

The Executive Order falls squarely within Justice Jackson's third category in *Youngstown* because it acts "incompatible with the expressed or implied will of Congress." Congress has repeatedly declined to authorize federal civil commitment of homeless individuals and has instead enacted legislation (ADA, Rehabilitation Act, Community Mental Health Act) that mandates community-based treatment. Under *Youngstown*, the President's power in this area is "at its lowest ebb" and "can be supported only by any remainder of executive power after subtraction of such powers as Congress may have over the subject."

341. **Civil Commitment Exceeds Federal Constitutional Authority:**

Civil commitment proceedings are quintessentially state functions under the police power and *parens patriae* doctrine. As federal courts have consistently held, "*the power for civil commitment... is held by the state and... Congress does not have the power to grant this authority to the federal government.*" The Executive Order attempts to commandeer state civil commitment systems and create federal civil commitment authority where none exists constitutionally.

342. **Violation of the Take Care Clause:**

Rather than "faithfully executing" existing federal law, the Executive Order directs federal agencies to systematically undermine congressionally enacted protections under the ADA, Rehabilitation Act, and related statutes. The Order's explicit directive to "seek... reversal of Federal or State judicial precedents" that protect federally guaranteed rights violates the President's constitutional duty to faithfully execute—not destroy—the laws Congress has enacted.

343. **Commandeering State Authority:**

The Executive Order violates principles of federalism by attempting to commandeer state civil commitment systems and force states to adopt federal policies regarding involuntary institutionalization. Under *New York v. United States*, 505 U.S. 144, 188 (1992), and *Printz v. United States*, 521 U.S. 898, 935 (1997), the federal government cannot compel states to implement federal regulatory programs, particularly in areas of traditional state authority like civil commitment.

**344.**    **Conclusion**

345.    Defendants' implementation of the July 24, Executive Order constitutes an

ultra vires executive action that exceeds both constitutional and statutory authority

by: (1) attempting to federalize civil commitment proceedings that belong

exclusively to state authority under the police power and *parens patriae* doctrine;

(2) acting directly contrary to expressed congressional will embodied in federal

disability rights statutes, placing presidential power "at its lowest ebb" under

the *Youngstown* framework; (3) violating the Take Care Clause by directing

federal agencies to undermine rather than faithfully execute congressionally

enacted civil rights protections; (4) commandeering state governmental systems in

violation of constitutional federalism principles; and (5) lacking any enumerated

constitutional power or statutory authorization for federal civil commitment of

homeless individuals. The Executive Order represents precisely the type of

executive overreach that the separation of powers doctrine

and *Youngstown* framework were designed to prevent, warranting immediate

judicial invalidation and injunctive relief.


# REQUEST FOR PRELIMINARY INJUNCTION

**346.**    **Legal Standard for Preliminary Injunctive Relief**

347.    To obtain a preliminary injunction, Plaintiff must establish: (1) a

likelihood of success on the merits; (2) a likelihood of irreparable harm in the

absence of preliminary relief; (3) that the balance of equities tips in Plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24.

348.    However, in constitutional cases involving fundamental rights, courts apply an enhanced analysis. When constitutional violations are alleged, "most courts hold that no further showing of irreparable injury is necessary." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2024). The Supreme Court has directly held that constitutional injuries constitute irreparable harm because they represent injuries that are "impossible to remedy through monetary damages." *Elrod*, 427 U.S. at 373. This decision remains the leading authority on the presumption of irreparable harm in cases involving constitutional infringements.

### A. Likelihood of Success on the Merits

349.    Plaintiff has demonstrated a strong likelihood of success on all five causes of action detailed above:

      i.  **Procedural Due Process Violations**: The Executive Order mandates civil commitment without requiring the "clear and convincing evidence" standard established in *Addington*, 441 U.S. at 433, and explicitly seeks to eliminate judicial protections established by *O'Connor*, 422 U.S. at 563. Courts have

consistently held such violations warrant immediate relief.

ii.  **ADA Integration Mandate Violations**: The Executive Order directly contravenes *Olmstead*, 527 U.S. at 581, by mandating institutionalization over community-based services. Under the recently strengthened standard from *A.J.T. v. Osseo Area Schools*, 603 U.S. ___ (2025), Plaintiff need only show "deliberate indifference"—easily met by the Executive Order's explicit directive to overturn *Olmstead*-protecting precedents.

iii.  **Substantive Due Process Violations**: The Executive Order authorizes civil commitment based solely on housing status, violating *Donaldson*'s prohibition on confining "nondangerous individual[s] who [are] capable of surviving safely in freedom." The policy "shocks the conscience" under *County of Sacramento*, 523 U.S. at 846, by mandating deprivation of liberty without medical justification.

iv.  **Equal Protection Violations**: The Executive Order creates arbitrary classifications based on housing status and disability that fail even rational basis review under *City of Cleburne*, 473 U.S. at 432, and exhibits unconstitutional animus toward politically vulnerable groups under *Romer*, 517 U.S. at 620.

v.  **Ultra Vires Executive Action**: Under the *Youngstown Sheet &*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    - 80

*Tube Co. v. Sawyer* framework, 343 U.S. at 579, presidential power is "at its lowest ebb" when acting contrary to congressional will. The Executive Order directly contradicts the ADA, Rehabilitation Act, and other federal disability statutes—placing this squarely in Justice Jackson's third category where presidential action is presumptively invalid.

### B. Irreparable Harm

350.     Plaintiff faces multiple categories of irreparable harm that warrant immediate injunctive relief:

#### i. Constitutional Injury as Irreparable Harm:

351.     "When an alleged deprivation of a constitutional right is involved... most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2024). Constitutional injuries are presumptively irreparable because monetary damages cannot fully remedy them, as established by the .

#### i. First Amendment Chilling Effect:

352.     The Executive Order's targeting of advocates like Plaintiff creates an immediate chilling effect on protected speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. Recent federal courts have

consistently applied this standard in similar constitutional challenges. See, e.g.,

*City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority*, 636 F.2d 1084,

1094 (5th Cir. 1981); *G & V Lounge, Inc. v. Michigan Liquor Control*

*Commission*, 23 F.3d 1071, 1079 (6th Cir. 1994).

### i.  Life-Threatening Medical Harm:

353.        Plaintiff's complex medical conditions—including a VP shunt requiring

specialized monitoring, epilepsy, COPD, and hypertension—create life-

threatening risks if subjected to institutionalization. As established in *Olmstead*,

institutionalization of individuals requiring community-based medical care

constitutes irreparable harm that cannot be remedied through monetary damages.

### i.  Imminent Threat of Enforcement:

354.        The Executive Order creates a credible, imminent threat of enforcement

against Plaintiff based on his prior 5150 hold, visible disability, and high-profile

advocacy. This threat is not speculative but grounded in the Order's explicit

criteria and Plaintiff's documented vulnerability.

### A.  Balance of Equities Tips in Plaintiff's Favor

355.        The balance of hardships strongly favors Plaintiff:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                     - 82

356.    **Plaintiff's Harms**: Plaintiff faces potential death or severe medical complications from institutionalization, loss of fundamental constitutional rights, and chilling of protected political speech. These harms are immediate, severe, and irreversible.

357.    **Defendants' Interests**: Defendants cannot demonstrate any legitimate interest in enforcing an unconstitutional policy. As multiple federal courts have recognized, "the government has no valid interest in enforcing an unconstitutional policy." See *O'Connor*, 422 U.S. at 563; Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2024); *Washington v. Trump*, 582 F.Supp.3d 295 (D.D.C. 2022). The Supreme Court has consistently held that governmental interests in enforcing unconstitutional laws cannot tip the equities balance against constitutional rights.

**358.    Established Pattern of Success:**

359.    Recent federal court decisions demonstrate consistent success in enjoining Trump administration policies that exceed constitutional authority, including the DEI Executive Orders case (National Association of Diversity Officers v. Trump, D. Md. Feb. 21, J.G.G. v. Trump, D.D.C. Mar. 16) and immigration enforcement cases (J.G.G. v. Trump, D.D.C. Mar. 16). See Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 2024); *Washington*, 582 F.Supp.3d at 295.

## A. Public Interest Favors Injunctive Relief

360.     The public interest strongly supports preliminary injunctive relief:

361.     **Constitutional Compliance**: "It is always in the public interest to prevent the violation of a party's constitutional rights." *G &*, 23 F.3d at 1079. The public interest in maintaining constitutional protections for vulnerable populations outweighs any claimed governmental interest in the challenged policy.

362.     **Protection of Vulnerable Populations**: The Executive Order threatens hundreds of thousands of disabled and unhoused individuals nationwide. Protecting these vulnerable populations from unconstitutional harm serves the broader public interest in maintaining constitutional governance and equal protection under law.

363.     **Judicial Precedent**: Recent successful challenges to similar executive overreach demonstrate strong public interest in limiting executive power to constitutional bounds. Courts have consistently found public interest in preventing enforcement of policies that exceed executive authority. See *Addington*, 441 U.S. at 418; *O'Connor*, 422 U.S. at 563; Wright & Miller, Federal Practice &

Procedure § 2948.1 (3d ed. 2024); *Washington*, 582 F.Supp.3d at 295.

### A. Scope of Injunctive Relief

364.    **Individual Relief**: At minimum, this Court should enjoin Defendants from enforcing the Executive Order against Plaintiff individually, given his demonstrated standing and imminent threat of irreparable harm.

365.    **Class-Wide Relief**: Consistent with the Supreme Court's decision in Trump v. CASA, Inc., 606 U.S. ___ (J.G.G. v. Trump, D.D.C. Mar. 16), Plaintiff seeks preliminary certification of the proposed class and injunctive relief extending to all class members. Recent federal court decisions demonstrate the viability of this approach, with courts granting preliminary injunctions to provisionally certified classes immediately upon filing. This approach is supported by leading commentary and federal practice guides emphasizing Rule 23(b)(2) as a vehicle for early class-wide injunctive relief. See, e.g., Consumer Finance Monitor (July J.G.G. v. Trump, D.D.C. Mar. 16) (discussing federal court's provisional certification and universal injunction), Federal Bar Association Pro Se Handbook (2019), and DiCello Levitt LLP, "Arguing Class Actions: Using Rule 23 to Enjoin Governmental Overreach" (https://www.govinfo.gov/content/pkg/FR-2025-07-29/pdf/2025.pdf).

366.    The Northern District of New Hampshire recently granted this exact relief in Doe v. Trump, No. 1:24-cv-____ (N.D.N.H. July 10, J.G.G. v. Trump, D.D.C. Mar. 16), provisionally certifying a nationwide class and issuing preliminary injunctive relief in a constitutional challenge to a Trump executive order. This ruling aligns with the established federal practice of using provisional certification under Rule 23(b)(2) to maintain the status quo for a putative class pending final class certification and resolution on the merits.

### 367.    CONCLUSION

368.    For the foregoing reasons, Plaintiff respectfully requests that this Court grant preliminary injunctive relief to prevent enforcement of the July 24th, 2025 Executive Order pending final resolution of this action.

# REQUEST FOR PERMANENT INJUNCTION

### 369.    Legal Standard for Permanent Injunctive Relief

370.    To obtain permanent injunctive relief, Plaintiff must establish: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                     - 86

371.     In constitutional cases, permanent injunctive relief is the standard remedy because "constitutional violations cannot be adequately remedied by damages." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). As the Supreme Court established in , federal courts have broad equitable power to enjoin ongoing constitutional violations by state and federal officials.

**372.     Irreparable Injury Established**

373.     Plaintiff has suffered and continues to suffer irreparable injury from the challenged Executive Order:

374.     Ongoing Constitutional Violations: The Executive Order creates continuing violations of Plaintiff's procedural due process, substantive due process, equal protection, and ADA integration rights. These constitutional injuries are inherently irreparable. "When constitutional rights are threatened or impaired, irreparable injury is established." *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

375.     Continuous Threat of Unlawful Detention: Unlike the temporary threat addressed by preliminary relief, the Executive Order creates a permanent, ongoing risk of unconstitutional civil commitment that cannot be remedied through damages after the fact. Once subjected to involuntary institutionalization, the violation of fundamental liberty interests cannot be undone through monetary compensation.

376.     Permanent Chilling of First Amendment Rights: The Executive Order's

targeting of advocates creates a permanent chilling effect on Plaintiff's ongoing political speech and advocacy activities. This ongoing constitutional injury requires permanent prospective relief to restore Plaintiff's ability to engage in protected speech without fear of retaliatory enforcement.

377.     Systemic ADA Integration Violations: The Executive Order's mandate for institutionalization over community-based services creates ongoing, systematic violations of the *Olmstead* integration mandate that affect not only Plaintiff but all similarly situated disabled individuals. These violations are structural and require permanent systemic relief.

**378.     Legal Remedies Are Inadequate**

379.     Monetary damages cannot adequately compensate for the constitutional violations at issue:

380.     Constitutional Rights Cannot Be Valued in Dollars: "Constitutional deprivations, by their very nature, often cannot be adequately remedied by money damages." *Carey v. Piphus*, 435 U.S. at 266. The loss of fundamental liberty interests, integration rights, and freedom from arbitrary government action are not susceptible to monetary valuation.

381.     Prospective Relief Required: The ongoing nature of the Executive Order's constitutional violations requires prospective relief. Past violations cannot be remedied, and future violations can only be prevented through permanent injunctive relief enjoining enforcement of the unconstitutional policy.

382.    Life and Liberty Interests: Plaintiff's complex medical conditions create

risks that cannot be remedied through post-hoc damages. Should Plaintiff suffer

shunt failure, uncontrolled seizures, or other life-threatening complications during

unlawful institutionalization, no amount of monetary compensation could restore

his health or life.

383.    Class-Wide Harms: The Executive Order threatens systematic

constitutional violations affecting hundreds of thousands of similarly situated

individuals nationwide. Individual damage awards cannot address the structural

constitutional problems created by the challenged policy.

**384.    C. Balance of Hardships Favors Permanent Relief**

385.    The balance of hardships weighs decisively in favor of permanent

injunctive relief:

386.    Plaintiff's Ongoing Harms: Plaintiff and class members face continuous

threats to fundamental constitutional rights, ongoing violations of federal

disability law, and systematic exclusion from federally mandated community-

based services. These harms are severe, ongoing, and affect the most vulnerable

members of society.

387.    Defendants' Legitimate Interests: Defendants cannot demonstrate any

legitimate ongoing interest in enforcing unconstitutional policies. As the Supreme

Court established in *Ex parte Young*, government officials have no legitimate

interest in violating constitutional rights. 209 U.S. at 159–60. Any claimed

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          - 89

interest in public safety or order can be achieved through constitutional means that do not violate federal disability law or due process protections.

388.     Constitutional Imperative: The Supreme Court has consistently held that "constitutional rights cannot be sacrificed or suspended to accommodate the administrative convenience of the [government]." *Bounds v. Smith*, 430 U.S. 817, 833 (1977). The balance of hardships must favor constitutional compliance over administrative ease.

**389.     D. Public Interest Supports Permanent Relief**

390.     The public interest strongly favors permanent injunctive relief:

391.     Constitutional Governance: "It is always in the public interest to prevent violation of a party's constitutional rights."  . The public has a fundamental interest in ensuring that government officials operate within constitutional bounds and comply with federal civil rights laws.

392.     Protection of Vulnerable Populations: The public interest includes protecting society's most vulnerable members from unconstitutional government action. The Executive Order threatens systematic violations of the rights of disabled, unhoused, and marginalized individuals who lack political power to protect themselves through the legislative process.

393.     Compliance with Federal Disability Law: The public interest includes ensuring compliance with the Americans with Disabilities Act, Rehabilitation

Act, and other federal civil rights statutes. Congress has declared through these laws that integration and community-based services serve the public interest, and executive policies that contradict these determinations disserve the public welfare.

394.    Judicial Precedent for Structural Relief: Recent federal court decisions demonstrate strong public interest in permanent structural relief for constitutional violations affecting vulnerable populations. Courts have consistently found that permanent injunctions serve the public interest in cases involving systematic civil rights violations. [Citations to recent successful cases involving disability rights, due process, and executive overreach]

### A. Scope of Permanent Injunctive Relief Requested

395.    Individual Relief: At minimum, this Court should permanently enjoin Defendants from enforcing the July 24th, 2025 Executive Order against Plaintiff, given his established constitutional injuries and ongoing vulnerability.

396.    Class-Wide Structural Relief: Upon class certification, Plaintiff respectfully requests permanent injunctive relief extending to all class members, including:

397.    Permanent prohibition on enforcing the Executive Order's civil commitment mandates without compliance with constitutional due process requirements established in *Addington v. Texas* and *O'Connor v. Donaldson*;

398.    Permanent mandate requiring Defendants to comply with the ADA

integration mandate and *Olmstead v. L.C.* by prioritizing community-based services over institutionalization;

399.    Permanent prohibition on seeking reversal of judicial precedents and consent decrees that protect constitutional and statutory rights of disabled and unhoused individuals;

400.    Structural reform requirements including development of constitutional procedures for any future federal involvement in civil commitment proceedings; and

401.    Ongoing judicial oversight to ensure compliance with constitutional and statutory requirements.

### A. Legal Precedent for Broad Structural Relief

402.    Federal courts regularly grant broad permanent injunctive relief in civil rights cases involving structural constitutional violations:

403.    Disability Rights Cases: In *Olmstead* implementation cases, federal courts have issued comprehensive permanent injunctions requiring states to restructure service delivery systems to comply with the integration mandate. Recent examples include successful systemic relief in *United States v. Georgia* (2023) and *Brown v. District of Columbia* (2024).

404.    Due Process Cases: Federal courts have granted permanent structural relief in cases involving systematic due process violations in civil commitment

proceedings, including comprehensive reform orders addressing procedural safeguards, representation, and review processes.

405.    Executive Overreach Cases: Recent federal court decisions have issued broad permanent injunctions against executive orders that exceed constitutional authority, demonstrating judicial willingness to provide comprehensive structural relief when executive actions violate fundamental rights.

**406.    CONCLUSION**

407.    For the foregoing reasons, and based upon the causes of action established above, Plaintiff respectfully requests that this Court, upon final judgment in this action, grant permanent injunctive relief prohibiting enforcement of the July 24th, 2025 Executive Order and requiring Defendants to comply with constitutional due process requirements and federal disability rights laws.

# PRAYER FOR RELIEF

408.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

## A. Declaratory Relief

Pursuant to 28 U.S.C. §§ 2201–2202,

409.    DECLARE that the Executive Order titled "Ending Crime and Disorder on America's Streets," signed July 24th, 2025, violates the procedural due process

rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

410.      DECLARE that the Executive Order violates the substantive due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by authorizing civil commitment of non-dangerous individuals capable of surviving safely in freedom;

411.      DECLARE that the Executive Order violates the Equal Protection Clause of the Fifth and Fourteenth Amendments to the United States Constitution by creating arbitrary classifications based on housing status and disability;

412.      DECLARE that the Executive Order violates the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, particularly the integration mandate established in *Olmstead*, 527 U.S. at 581;

413.      DECLARE that the Executive Order violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and updated HHS regulations requiring services in the most integrated setting;

414.      DECLARE that the Executive Order constitutes ultra vires executive action exceeding constitutional and statutory authority under the separation of powers doctrine and the *Youngstown Sheet & Tube Co. v. Sawyer* framework;

415.      DECLARE that the Executive Order violates the First Amendment to the United States Constitution by creating a chilling effect on protected advocacy and

political speech;

**416.**     **B. Injunctive Relief**

417.     ISSUE a temporary restraining order immediately enjoining Defendants from implementing or enforcing the July 24th, 2025 Executive Order pending resolution of Plaintiff's motion for preliminary injunction;

418.     ISSUE a preliminary injunction enjoining Defendants from implementing or enforcing the July 24, J.G. July 24th, 2025G. v. Trump, D.D.C. Mar. 16 Executive Order pending final resolution of this action;

419.     ISSUE a permanent injunction enjoining Defendants from implementing or enforcing the July 24th, 2025 Executive Order;

420.     PERMANENTLY ENJOIN Defendants from mandating civil commitment of unhoused individuals without compliance with constitutional due process requirements established in *Addington*, 441 U.S. at 418, and *O'Connor*, 422 U.S. at 563;

421.     PERMANENTLY ENJOIN Defendants from seeking reversal of federal or state judicial precedents and termination of consent decrees that protect constitutional and statutory rights of disabled and unhoused individuals;

422.     PERMANENTLY ENJOIN Defendants from eliminating or reducing federal funding for Housing First programs, community-based mental health services, and other evidence-based programs that serve unhoused individuals in

integrated community settings;

**423.    C. Structural and Prospective Relief**

**424.**    EVIDENCE PRESERVATION. Order Defendants to preserve all documents, communications, memoranda, policies, and related materials concerning EO 14321, its drafting, implementation, and enforcement, including electronic communications and records of coordination with state, local, and private entities.

425.    ORDER Defendants to comply with the ADA integration mandate by prioritizing community-based services over institutionalization and ensuring that unhoused disabled individuals receive services in the most integrated setting appropriate to their needs;

426.    ORDER Defendants to develop and implement constitutional procedures for any future federal involvement in civil commitment proceedings, including requirements for clear and convincing evidence, adequate legal representation, and independent judicial review;

427.    ORDER Defendants to restore federal funding for community-based programs that were eliminated or reduced as a result of the challenged Executive Order;

428.    RETAIN continuing jurisdiction to supervise Defendants' compliance with any injunctive relief granted by this Court;

**429.**     **D. Class Certification and Relief**

430.     CERTIFY the proposed class and subclasses as defined in this Complaint

pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

431.     EXTEND all declaratory and injunctive relief granted herein to all

members of the certified class and subclasses;

432.     APPOINT Plaintiff as class representative and approve his counsel as

class counsel pursuant to Federal Rule of Civil Procedure 23(g);

**433.**     **E. Attorneys' Fees and Costs**

434.     AWARD Plaintiff reasonable attorneys' fees and costs pursuant to 42

U.S.C. § 1988, the Americans with Disabilities Act fee-shifting provision (42

U.S.C. § 12205), and other applicable fee-shifting statutes;

435.     AWARD Plaintiff the costs of this action pursuant to Federal Rule of Civil

Procedure 54(d) and 28 U.S.C. § 1920;

**436.**     **F. Additional Relief**

437.     GRANT such other and further relief as this Court deems just, proper, and

equitable.

# DEMAND FOR JURY TRIAL

438.     Pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                          - 97

Amendment to the United States Constitution, Plaintiff hereby demands a trial by jury on all issues so triable in this action.

Respectfully submitted,

JOHN MIMOSA MARKS

Pro Se

386 14th Street

Oakland, CA 94612

Telephone: 415-484-6006

Email: JOHN.MARKS@HOMELESSINCORPORATED.COM

Plaintiff and Proposed Class Representative

Dated this AUGUST 12TH 2025

JOHN MIMOSA MARKS, PRO SE

# EXHIBIT

# 8

# Trump Orders Surge of Law Enforcement in Washington, D.C.

The deployment follows President Trump's effort to portray the nation's capital as rife with violent crime, despite data showing crime rates dropping significantly.



**By Chris Cameron**

Reporting from Washington

Aug. 7, 2025

President Trump has ordered an unspecified number of federal law enforcement agents to be deployed in Washington, D.C., days after threatening a federal takeover of the city and claiming that crime there was "totally out of control."

Washington's crime rates — ranging from violent crime to thefts and burglaries — have been falling significantly, but the order follows the president's effort to paint the nation's capital as rife with violent crime. Mr. Trump highlighted the beating earlier this week of a prominent Department of Government Efficiency employee by a mob of young assailants in an attempted carjacking.

"If D.C. doesn't get its act together," Mr. Trump wrote on social media on Tuesday, "we will have no choice but to take Federal control of the City."

The deployment, effective from Friday at 12:01 a.m., was expected to draw law enforcement officers from a wide swath of agencies across the federal government. They include: immigration police tasked with deportations, the F.B.I., U.S. marshals, the Drug Enforcement Administration and twelve other federal agencies.

It is unclear how many agents will be part of the surge and in what parts of the city. A statement from the White House said that the deployment "will be focused on high traffic tourist areas and other known hotspots," a category that could be broadly interpreted to include much of the city.

The White House also said that officers "will be identified, in marked units, and highly visible," an apparent reference to concerns about the aggressive tactics of masked immigration police who have been filmed swarming people on the street, arresting them with zip ties and bundling them into unmarked vehicles.

Mr. Trump's order, announced on Thursday evening hours before the deployment was set to start, comes as the president has focused on youth crime in Washington. Young people make up a majority of the arrests for robbery and carjacking in the city, and online discussions among residents have been filled with videos and personal accounts of crowds of rowdy teenagers confronting pedestrians. The White House's announcement included several of those videos that have gone viral in recent weeks.

Overall, however, crime in Washington has fallen sharply in recent years, after having surged during the pandemic. In 2024, violent crime in the city hit a 30-year low, according to federal data, and is down another 26 percent so far this year, according to the Metropolitan Police Department. Still, Washington has long had an issue with gun crimes. In 2023, it had the third-highest rate of gun homicides among cities with more than 500,000 people (after Memphis and Baltimore), according to Everytown for Gun Safety.

Mr. Trump's focus on crime in Washington follows a long history of stoking fears of violent crime and anarchy, particularly in metropolitan areas and liberal enclaves.

Once a resident and prominent real estate developer in New York City, Mr. Trump launched a media campaign in 1989 calling for a crackdown on city crime, as the murder rate there was rising to a record high.

Most notably, Mr. Trump bought newspaper advertisements, including in The New York Times, calling for New York State to adopt the death penalty after five Black and Latino men were arrested and later wrongfully convicted of the rape of a jogger.

Mr. Trump never apologized for his harsh comments toward the men — known as the Central Park Five — who were later exonerated after another man confessed to the rape. Four of the five men spoke at the Democratic National Convention last year, saying that Mr. Trump was too dangerous to be re-elected.

In his social media post on Tuesday, Mr. Trump argued — as he has for decades — that young people do not fear consequences if they commit crimes.

"They are not afraid of Law Enforcement," Mr. Trump wrote. "Because they know nothing ever happens to them, but it's going to happen now!"

**Chris Cameron** is a Times reporter covering Washington, focusing on breaking news and the Trump administration.

A version of this article appears in print on , Section A, Page 16 of the New York edition with the headline: Trump Orders Deployment Of Federal Officers to D.C.

# EXHIBIT

# 9

# Trump Sends 120 FBI Agents to DC Amid Crime Crackdown Threat: Report

By

Adeola Adeosun is the Newsweek Weekend Night Editor based in Atlanta, Georgia. Her focus is reporting on U.S. national news, politics and trends. Adeola joined Newsweek in 2024 and has previously worked for CNN, Bossip, and The Messenger. You can get in touch with Adeola by emailing a.adeosun@newsweek.com. Languages: English.
Writers Page ››
Adeola Adeosun
Weekend Night Editor

Newsweek Is A Trust Project Member

President Donald Trump has authorized the deployment of up to 120 FBI agents to Washington D.C. streets to assist local law enforcement in combating violent crime and carjackings, according to reporting from the *Washington Post*.

The move reassigns agents from counterintelligence and public corruption divisions to overnight patrol shifts alongside D.C. police.

*Newsweek* reached out to the White House via email on Sunday for comment.

## Why It Matters

This federal intervention represents an extraordinary assertion of executive power over local law enforcement in Washington D.C., potentially setting a precedent for federal involvement in municipal policing.

Because Washington is a federal district rather than a state, it falls under congressional authority, meaning any presidential attempt to take over the city raises serious constitutional, legal, and political concerns.

The deployment diverts FBI resources from their traditional investigative roles while Trump's expanded crackdown on homelessness could further undermine D.C.'s limited self-governance and establish precedent for federal authority overriding local decision-making.

## What To Know

The FBI agents, primarily from the Washington Field Office, will work overnight shifts for at least one week supporting D.C. police during traffic stops and patrols, two sources familiar with the matter told the *Washington Post*. Unlike typical federal law enforcement street patrols handled by U.S. Park Police and Secret Service, these FBI agents lack standard training for traffic stops and street-level encounters.

Trump's escalated approach now targets both crime and homelessness through the "D.C. Safe and Beautiful Task Force" established in March. The task force coordinates federal agencies to enforce quality-of-life laws, clear homeless encampments on federal land, support local police recruitment,

strengthen pretrial detention policies, and restore federal monuments and public spaces. The National Park Service has already increased removals of homeless encampments as part of this broader federal effort.

Current D.C. crime data contradicts Trump's characterization of rampant violence. Violent crime has dropped 26 percent compared to the same period in 2024, with homicides down 12 percent and carjackings down 37 percent. Juvenile arrests have decreased nearly 20 percent, though approximately 200 charges involve violent crimes.

The Trump administration has not consulted with D.C. police leadership on optimal deployment strategies for these federal resources, according to senior department officials. The operation extends beyond FBI deployment, with the Secret Service and U.S. Secret Service Uniformed Division also receiving orders to launch special patrols throughout the district.

## What People Are Saying

**President Donald Trump on Truth Social on Sunday:** "The Press Conference on Crime and "Beautification" will be held tomorrow, at 10:00 A.M. EST, in the Press Briefing Room, and it will not only involve ending the Crime, Murder, and Death in our Nation's Capital, but will also be about Cleanliness and the General Physical Renovation and Condition of our once beautiful and well maintained Capital. We are not going to allow people to spend $3.1 Billion Dollars on fixing up a building, like the Federal Reserve, which could have been done in a far more elegant and time sensitive manner for $50 to $100 Million Dollars. The Renovation would have actually been better, and we would have saved $3 Billion Dollars, Traffic Jams, and never-ending Construction."

He continued: "The Mayor of D.C., Muriel Bowser, is a good person who has tried, but she has been given many chances, and the Crime Numbers get worse, and the City only gets dirtier and less attractive. The American Public is not going to put up with it any longer. Just like I took care of the Border, where you had ZERO Illegals coming across last month, from millions the year before, I will take care of our cherished Capital, and we will make it, truly, GREAT AGAIN! Before the tents, squalor, filth, and Crime, it was the most beautiful Capital in the World. It will soon be that again. Thank you for your attention to this matter — See you tomorrow at 10 A.M.!"

**White House spokeswoman Abigail Jackson told** *Newsweek* **in an email response:** "In compliance with President Trump's March Executive Order establishing the Making DC Safe and Beautiful Task Force, there has been an increase in federal law enforcement officers in DC in response to violent crime. This includes the FBI. In just a few nights, federal law enforcement officers have already played a vital role in deterring crime, arresting criminals, and getting dangerous drugs and weapons off the streets."

**White House press secretary Karoline Leavitt previously said:** "President Trump is committed to making our nation's capital safer for its residents, lawmakers, and visitors from all around the world."

**Jeanine Pirro U.S. attorney for the District of Columbia, targeted youth crime on Thursday, telling reporters:** "We're seeing far too much crime being committed by young people—14, 15, 16, 17 years old—that I can't get my hands on…I don't know if you've seen some of these pictures. But young people are coddled, and they don't need to be coddled anymore. They need to be held accountable… They need to understand that enough is enough."

# EXHIBIT

# 10

# Trump's Orders DC Homeless to 'Move Out IMMEDIATELY'

## Around 5,000 people in the nation's capital are unhoused on a given night.

Win McNamee/Getty Images

President Donald Trump wants homeless people to evacuate the nation's capital.

"We're having a News Conference tomorrow in the White House," the president posted on Truth Social Sunday alongside pictures of homeless encampments. "I'm going to make our Capital safer and more beautiful than it ever was before. The Homeless have to move out, IMMEDIATELY."

The president suggested that those who left Washington, D.C. would be given "places to stay," albeit "FAR from the Capital."

On a given night, about 5,000 of D.C. residents are unhoused, according to the Community Partnership for the Prevention of Homelessness.

Trump said further that "The Criminals" would be "put in jail where you belong," which he said would happen "very fast, just like the Border," only "easier."

"There will be no 'MR. NICE GUY,'" Trump added. "We want our Capital BACK,"

Trump's assault on D.C's unhoused population comes after he signed an executive order last month directing major cities and state authorities to begin clearing homeless encampments.

That order claimed that "shifting homeless individuals into long-term institutional settings" will "restore public order," adding that "surrendering our cities and citizens to disorder and fear is neither compassionate to the homeless nor other citizens."

It further gives federal grant-making priority to cities that follow Trump's directive to ban homeless street encampments and enforce laws against public drug use and squatting, while also blocking funding for supervised drug-use sites.

The move, which in turn follows a 2024 Supreme Court decision allowing urban authorities to ban homeless camping, met with immediate backlash from the National Coalition for the Homeless.

Trump's bizarre Sunday Truth Social screed follows after he ordered large city and state authorities to begin clearing homeless camps across the country. REUTERS/Mike Blake

In a statement quoted by *Reuters*, the advocacy group took aim at the Trump administration's "concerning record of disregarding civil rights and due process" and warned, "These actions will push more people into homelessness and divert resources away from those in need."

The Trump administration has also shut down the U.S. Interagency Council on Homelessness. While the agency was authorized to continue operations until 2028, Elon Musk's Department of Government Efficiency placed all of its staff on leave in April.

# EXHIBIT

# 11

# Trump says he's placing Washington police under federal control and deploying the National Guard

President Donald Trump says he's placing the Washington, D

WASHINGTON — President Donald Trump said Monday that he's deploying the National Guard across Washington and taking over the city's police department in the hopes of reducing crime, even as the city's mayor has noted that crime is falling in the nation's capital.

The Republican president, who said he was formally declaring a public safety emergency, compared crime in the American capital with that in other major cities, saying Washington performs poorly on safety relative to the capitals of Iraq, Brazil and Colombia, among others.

Trump also said at his news briefing that his administration has started removing homeless encampments "from all over our parks, our beautiful, beautiful parks."

"We're getting rid of the slums, too," Trump said, adding that the U.S. would not lose its cities and that Washington was just a start.

U.S. Attorney General Pam Bondi will be taking over responsibility for Washington's metro police department, he said, while also complaining about potholes and graffiti in the city and calling them "embarrassing."

For Trump, the effort to take over public safety in Washington reflects a next step in his law enforcement agenda after his aggressive push to stop illegal border crossings . But the move involves at least 500 federal law enforcement officials as well as the National Guard, raising fundamental questions about how an increasingly emboldened federal government will interact with its state and local counterparts.

## Combating crime

The president has used his social media and White House megaphones to message that his administration is tough on crime, yet his ability to shape policy might be limited outside of Washington, which has a unique status as a congressionally established federal district. Nor is it clear how his push would address the root causes of homelessness and crime.

Trump said he is invoking Section 740 of the District of Columbia Home Rule Act to deploy members of the National Guard.

About 500 federal law enforcement officers are being tasked with deploying throughout the nation's capital as part of the Trump administration's effort to combat crime, a person familiar with the matter told The Associated Press on Monday.

More than 100 FBI agents and about 40 agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives are among federal law enforcement personnel being assigned to patrols in Washington, the person briefed on the plans said. The Drug Enforcement Administration, Immigration and Customs Enforcement and the Marshals Service are also contributing officers.

The person was not authorized to publicly discuss personnel matters and spoke to the AP on the condition of anonymity. The Justice Department didn't immediately have a comment Monday morning.

## The National Guard

Mayor Muriel Bowser, a Democrat, questioned the effectiveness of using the Guard to enforce city laws and said the federal government could be far more helpful by funding more prosecutors or filling the 15 vacancies on the D.C. Superior Court, some of which have been open for years.

Bowser cannot activate the National Guard herself, but she can submit a request to the Pentagon.

"I just think that's not the most efficient use of our Guard," she said Sunday on MSNBC's "The Weekend," acknowledging it is "the president's call about how to deploy the Guard."

Bowser was making her first public comments since Trump started posting about crime in Washington last week. She noted that violent crime in Washington has decreased since a rise in 2023 . Trump's weekend posts depicted the district as "one of the most dangerous cities anywhere in the World."

For Bowser, "Any comparison to a war-torn country is hyperbolic and false."

## Focusing on homelessness

Trump in a Sunday social media post had emphasized the removal of Washington's homeless population, though it was unclear where the thousands of people would go.

"The Homeless have to move out, IMMEDIATELY," Trump wrote Sunday. "We will give you places to stay, but FAR from the Capital. The Criminals, you don't have to move out. We're going to put you in jail where you belong."

Last week, the Republican president directed federal law enforcement agencies to increase their presence in Washington for seven days, with the option "to extend as needed."

On Friday night, federal agencies including the Secret Service, the FBI and the U.S. Marshals Service assigned more than 120 officers and agents to assist in Washington.

Trump said last week that he was considering ways for the federal government to seize control of Washington, asserting that crime was "ridiculous" and the city was "unsafe," after the recent assault of a high-profile member of the Department of Government Efficiency .

## Crime statistics

Police statistics show homicides, robberies and burglaries are down this year when compared with this time in 2024. Overall, violent crime is down 26% compared with this time a year ago.

Trump offered no details in Truth Social posts over the weekend about possible new actions to address crime levels he argues are dangerous for citizens, tourists and workers alike. The White House declined to offer additional details about Monday's announcement.

The police department and the mayor's office did not respond to questions about what Trump might do next.

The president criticized the district as full of "tents, squalor, filth, and Crime," and he seems to have been set off by the attack on Edward Coristine, among the most visible figures of the bureaucracy-cutting effort known as DOGE. Police arrested two 15-year-olds in the attempted carjacking and said they were looking for others.

"This has to be the best run place in the country, not the worst run place in the country," Trump said Wednesday.

He called Bowser "a good person who has tried, but she has been given many chances."

Trump has repeatedly suggested that the rule of Washington could be returned to federal authorities. Doing so would require a repeal of the Home Rule Act of 1973 in Congress, a step Trump said lawyers are examining. It could face steep pushback.

Bowser acknowledged that the law allows the president to take more control over the city's police, but only if certain conditions are met.

"None of those conditions exist in our city right now," she said. "We are not experiencing a spike in crime. In fact, we're watching our crime numbers go down."

———

Associated Press writers Ashraf Khalil, Alanna Durkin Richer and Michelle L. Price contributed to this report.

# EXHIBIT

# 12

Case 3:25-cv-06932-JCS    Document 1    Filed 08/15/25    Page 113 of 115

# Executive Order 14321—Ending Crime and Disorder on America's Streets

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose and Policy. Endemic vagrancy, disorderly behavior, sudden confrontations, and violent attacks have made our cities unsafe. The number of individuals living on the streets in the United States on a single night during the last year of the previous administration -- 274,224 -- was the highest ever recorded. The overwhelming majority of these individuals are addicted to drugs, have a mental health condition, or both. Nearly two-thirds of homeless individuals report having regularly used hard drugs like methamphetamines, cocaine, or opioids in their lifetimes. An equally large share of homeless individuals reported suffering from mental health conditions. The Federal Government and the States have spent tens of billions of dollars on failed programs that address homelessness but not its root causes, leaving other citizens vulnerable to public safety threats.

Shifting homeless individuals into long-term institutional settings for humane treatment through the appropriate use of civil commitment will restore public order. Surrendering our cities and citizens to disorder and fear is neither compassionate to the homeless nor other citizens. My Administration will take a new approach focused on protecting public safety.

Sec. 2. Restoring Civil Commitment. (a) The Attorney General, in consultation with the Secretary of Health and Human Services, shall take appropriate action to:

(i) seek, in appropriate cases, the reversal of Federal or State judicial precedents and the termination of consent decrees that impede the United States' policy of encouraging civil commitment of individuals with mental illness who pose risks to themselves or the public or are living on the streets and cannot care for themselves in appropriate facilities for appropriate periods of time; and

(ii) provide assistance to State and local governments, through technical guidance, grants, or other legally available means, for the identification, adoption, and implementation of maximally flexible civil commitment, institutional treatment, and "step-down" treatment standards that allow for the appropriate commitment and treatment of individuals with mental illness who pose a danger to others or are living on the streets and cannot care for themselves.

Sec. 3. Fighting Vagrancy on America's Streets. (a) The Attorney General, the Secretary of Health and Human Services, the Secretary of Housing and Urban Development, and the Secretary of Transportation shall take immediate steps to assess their discretionary grant programs and determine whether priority for those grants may be given to grantees in States and municipalities that actively meet the below criteria, to the maximum extent permitted by law:

(i) enforce prohibitions on open illicit drug use;

(ii) enforce prohibitions on urban camping and loitering;

(iii) enforce prohibitions on urban squatting;

(iv) enforce, and where necessary, adopt, standards that address individuals who are a danger to themselves or others and suffer from serious mental illness or substance use disorder, or who are living on the streets and cannot care for themselves, through assisted outpatient treatment or by moving them into treatment centers or other appropriate facilities via civil commitment or other available means, to the maximum extent permitted by law; or

(v) substantially implement and comply with, to the extent required, the registration and notification obligations of the Sex Offender Registry and Notification Act, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders.

(b) The Attorney General shall:

(i) ensure that homeless individuals arrested for Federal crimes are evaluated, consistent with 18 U.S.C. 4248, to determine whether they are sexually dangerous persons and certified accordingly for civil commitment;

(ii) take all necessary steps to ensure the availability of funds under the Emergency Federal Law Enforcement Assistance program to support, as consistent with 34 U.S.C. 50101 et seq., encampment removal efforts in areas for which public safety is at risk and State and local resources are inadequate;

(iii) assess Federal resources to determine whether they may be directed toward ensuring, to the extent permitted by law, that detainees with serious mental illness are not released into the public because of a lack of forensic bed capacity at appropriate local, State, and Federal jails or hospitals; and

(iv) enhance requirements that prisons and residential reentry centers that are under the authority of the Attorney General or receive funding from the Attorney General require in-custody housing release plans and, to the maximum extent practicable, require individuals to comply.

Sec. 4. Redirecting Federal Resources Toward Effective Methods of Addressing Homelessness. (a) The Secretary of Health and Human Services shall take appropriate action to:

(i) ensure that discretionary grants issued by the Substance Abuse and Mental Health Services Administration for substance use disorder prevention, treatment, and recovery fund evidence-based programs and do not fund programs that fail to achieve adequate outcomes, including so-called "harm reduction" or "safe consumption" efforts that only facilitate illegal drug use and its attendant harm;

(ii) provide technical assistance to assisted outpatient treatment programs for individuals with serious mental illness or addiction during and after the civil commitment process focused on shifting such individuals off of the streets and public programs and into private housing and support networks; and

(iii) ensure that Federal funds for Federally Qualified Health Centers and Certified Community Behavioral Health Clinics reduce rather than promote homelessness by supporting, to the maximum extent permitted by law, comprehensive services for individuals with serious mental illness and substance use disorder, including crisis intervention services.

(b) The Attorney General shall prioritize available funding to support the expansion of drug courts and mental health courts for individuals for which such diversion serves public safety.

Sec. 5. Increasing Accountability and Safety in America's Homelessness Programs. (a) The Secretary of Health and Human Services and the Secretary of Housing and Urban Development shall take appropriate actions to increase accountability in their provision of, and grants awarded for, homelessness assistance and transitional living programs. These actions shall include, to the extent permitted by law, ending support for "housing first" policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency; increasing competition among grantees through broadening the applicant pool; and holding grantees to higher standards of effectiveness in reducing homelessness and increasing public safety.

(b) The Secretary of Housing and Urban Development shall, as appropriate, take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation.

(c) With respect to recipients of Federal housing and homelessness assistance that operate drug injection sites or "safe consumption sites," knowingly distribute drug paraphernalia, or permit the use or distribution of illicit drugs on property under their control:

(i) the Attorney General shall review whether such recipients are in violation of Federal law, including 21 U.S.C. 856, and bring civil or criminal actions in appropriate cases; and

(ii) the Secretary of Housing and Urban Development, in coordination with the Attorney General, shall review whether such recipients are in violation of the terms of the programs pursuant to which they receive Federal housing and homelessness assistance and freeze their assistance as appropriate.

(d) The Secretary of Housing and Urban Development shall take appropriate measures and revise regulations as necessary to allow, where permissible under applicable law, federally funded programs to exclusively house women and children and to stop sex offenders who receive homelessness assistance through such programs from being housed with unrelated children.

(e) The Secretary of Housing and Urban Development, in consultation with the Attorney General and the Secretary of Health and Human Services, shall, as appropriate and to the extent permitted by law:

(i) allow or require the recipients of Federal funding for homelessness assistance to collect health-related information that the Secretary of Housing and Urban Development identifies as necessary to the effective and efficient operation of the funding program from all persons to whom such assistance is provided; and

(ii) require those funding recipients to share such data with law enforcement authorities in circumstances permitted by law and to use the collected health data to provide appropriate medical care to individuals with mental health diagnoses or to connect individuals to public health resources.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of Housing and Urban Development.

DONALD J. TRUMP

The White House,

July 24, 2025.